# CASES

## ARGUED AND DETERMINED

IN THE

## UNITED STATES CIRCUIT COURTS OF APPEALS AND THE DISTRICT COURTS

---

ATCHISON, T. & S. F. RY. CO. v. SPILLER. *

(Circuit Court of Appeals, Eighth Circuit.   October 26, 1917.)

No. 4819.

1. COMMERCE ☞87—INTERSTATE COMMERCE COMMISSION—CONDUCT OF PRO-
CEEDINGS—EVIDENCE.
    While the Interstate Commerce Commission in making investigations
should not be too narrowly constrained by the technical rules as to the
admissibility of proof, nor hampered by those narrow rules which prevail
in trials at common law, yet, by reason of the liberality of practice in ad-
mitting testimony, it is more imperative to preserve the essential rules
of evidence by which rights are asserted or defended, and the commission-
ers cannot act upon their own information, but the parties must be fully
apprised of the evidence submitted and given an opportunity to cross-ex-
amine witnesses, inspect documents, and offer evidence in explanation or
rebuttal.

2. COMMERCE ☞88—INTERSTATE COMMERCE COMMISSION—ORDERS—VALIDITY.
    Administrative orders quasi judicial in character are void if hearing
was denied, if that granted was inadequate or manifestly unfair, if the
finding was contrary to the indisputable character of the evidence, or if
the facts found do not support the order.

3. COMMERCE ☞88—INTERSTATE COMMERCE COMMISSION—ORDERS.
    An order of the Interstate Commerce Commission based on a finding un-
supported by evidence is contrary to law and must be set aside by a court
of competent jurisdiction.

4. COMMERCE ☞88—INTERSTATE COMMERCE COMMISSION—TRIAL—FINDINGS.
    An order of reparation made by Interstate Commerce Commission un-
der Act to Regulate Commerce (Act Feb. 4, 1887, c. 104, § 16, 24 Stat. 384
[Comp. St. 1916, § 8584]), awarding damages for a violation of section 1
(Comp. St. 1916, § 8563), prohibiting unreasonable rates, requires a find-
ing disclosing the relation of the parties as shipper and carrier, the
character and amount of the traffic out of which the claims arose, the
rates paid by the shipper for the service rendered, whether they were un-
reasonable and whether the shipper was injured, and, if so, the amount of
his damage.

5. COMMERCE ☞91—INTERSTATE COMMERCE COMMISSION—REPARATION ORDERS.
    An action against a carrier based on a reparation order of the Interstate
Commerce Commission awarding damages for the exaction of unreason-
able rates in violation of Act to Regulate Commerce, § 1, should proceed
in all respects like other civil suits for damages, except that on the trial
the findings and order of the commission are, pursuant to section 16,
prima facie evidence of the facts therein stated.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

246 F.—1          *Rehearing denied March 11, 1918.

6. COMMERCE ☞95—INTERSTATE COMMERCE COMMISSION—FINDINGS.

In an action on a reparation order of the Interstate Commerce Commission awarding damages for violation of Act to Regulate Commerce, § 1, prohibiting unreasonable rates, the commission's finding that claimant's assignors had paid the unreasonable rates *held* unsupported by the evidence.

7. EVIDENCE ☞317(2)—ADMISSIBILITY—HEARSAY.

In a proceeding before the Interstate Commerce Commission for reparation order awarding damages for exaction of unreasonable freight rates, testimony that witness had obtained from commission houses to which shippers had consigned their cattle and from other sources data showing shipments by individuals not shown to be the owners of cattle is the worst kind of hearsay.

8. COMMERCE ☞87—INTERSTATE COMMERCE COMMISSION—PROCEEDINGS—OBJECTION.

As proceedings before the Interstate Commerce Commission are conducted in an informal way, counsel are not required to present objections to inadmissible testimony with the same nicety required in an action in court, and repeated assertions that claims presented for damages on account of the exaction of unreasonable rates were unsupported by proof showed that counsel for carriers did not acquiesce in hearsay proof of claimants' demands.

9. COMMERCE ☞95—INTERSTATE COMMERCE COMMISSION—ORDERS.

In an action on a reparation order of the Interstate Commerce Commission, where it was contended that the findings of the commission on which the order was based were unsupported by substantial evidence, the court may consider the character of the evidence introduced in support of the order.

10. COMMERCE ☞87—INTERSTATE COMMERCE COMMISSION—PROCEEDINGS.

In a proceeding by an assignee before the Interstate Commerce Commission for damages on account of the exaction of unreasonable rates from his assignors, the assignee must establish the assignments.

11. COMMERCE ☞87—INTERSTATE COMMERCE COMMISSION—PROCEEDINGS.

In a proceeding before the Interstate Commerce Commission by an assignee to recover damages on account of the exaction of unreasonable rates from his assignors, evidence *held* insufficient to show assignment of claims to the assignee.

12. COMMERCE ☞88—INTERSTATE COMMERCE COMMISSION—RATES—ESTABLISHMENT.

Under Act to Regulate Commerce, § 15, as amended in 1906 (Act June 29, 1906, c. 3591, § 4, 34 Stat. 589 [Comp. St. 1916, § 8583]), providing that the Interstate Commerce Commission is authorized and empowered to determine and prescribe what will be just and reasonable individual or joint rate or rates or charges to be thereafter observed for such period of time not exceeding two years as shall be prescribed in the order, it is improper for the commission, having ordered reduced rates for a period of two years, to order reparation solely on account of the previous exaction of higher rates during a previous period of over two years, for the grant of the reparation, being based entirely on the difference in rates, was tantamount to the establishment of a rate for over four years, and without giving notice as to when it should go into effect.

13. COMMERCE ☞97—INTERSTATE COMMERCE COMMISSION—ORDERS—ACTION ON.

In an action on a reparation order of the Interstate Commerce Commission in favor of shippers based on the exaction of unreasonable rates, the question whether the rate exacted was unjust and unreasonable is open.

14. CARRIERS ☞202—RATES—RECOVERY.

Where a rate subsequently condemned by the Interstate Commerce Commission as unreasonable was when exacted a legal rate, the shipper could not sue in a court of law and recover back any portion of such rate.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

15. COMMERCE ⬤➞88 — INTERSTATE COMMERCE COMMISSION — REPARATION — RIGHT TO AUTHORIZE.

The Interstate Commerce Commission ordered reparation on account of the exaction of unreasonable rates during a period extending from August 29, 1906, when the commission received the rate-making power under the Hepburn Amendment to November 17, 1908, the date fixed by the commission when certain reduced rates should take effect. The reparation was measured entirely by the difference in rates. *Held*, that as the grant of reparation was practically the establishment of the rate for a longer period than authorized, and as the shipper could not, the rate having been legal when exacted, recover any sum on account of his payment thereon in a court of law, the order by the Interstate Commerce Commission was improper.

16. COMMERCE ⬤➞88 — INTERSTATE COMMERCE COMMISSION — UNREASONABLE RATES—DAMAGES.

Where railroad companies exacted unreasonable rates for the transportation of cattle to markets, the difference between the unreasonable rates exacted and reasonable rates subsequently established cannot be made the only basis for a reparation order for damages under Act to Regulate Commerce, § 16, without any showing that the shippers were actually damaged from the exaction of such illegal rates, for freight rates obviously would affect the prices to be paid at destination.

In Error to the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge.

Actions by E. B. Spiller against the Atchison, Topeka & Santa Fé Railway Company, against the Chicago & Eastern Illinois Railroad Company, against the Chicago & Alton Railroad Company, against the Missouri Pacific Railway Company, against the St. Louis, Iron Mountain & Southern Railway Company, against the St. Louis & San Francisco Railroad Company, against the Chicago, Rock Island & Pacifie Railway Company, against the Illinois Central Railroad Company, and against the Missouri, Kansas & Texas Railway Company. There were judgments for plaintiff, and defendants bring error; the causes being consolidated and heard by stipulation on the record in the case of the Atchison, Topeka & Santa Fé Railway Company. Reversed, and new trial ordered.

T. J. Norton and Gardiner Lathrop, both of Chicago, Ill. (Robert Dunlap, of Chicago, Ill., Thomas R. Morrow, of Kansas City, Mo., J. W. Jamison and C. S. Burg, both of St. Louis, Mo., and R. V. Fletcher and W. F. Dickinson, both of Chicago, Ill., on the brief), for plaintiffs in error.

B. F. Deatherage, of Kansas City, Mo., and S. H. Cowan, of Ft. Worth, Tex. (I. H. Burney, of Ft. Worth, Tex., and G. Creason, of Kansas City, Mo., on the brief), for defendant in error.

Before SANBORN and CARLAND, Circuit Judges, and BOOTH, District Judge.

CARLAND, Circuit Judge. Defendant in error, hereafter called "plaintiff," commenced an action against the several plaintiffs in error, hereafter called "defendants," to recover from each of them the amount awarded plaintiff by an order of reparation made by the Interstate Commerce Commission January 12, 1914. A count for treble

⬤➞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

damages under Act July 2, 1890, c. 647, 26 Stat. 210, and Act Aug. 27, 1894, c. 349, 28 Stat. 509, 570, was abandoned at the trial. By stipulation a jury was waived and the cases against the Atchison, Topeka & Santa Fé Railway Company and the Missouri, Kansas & Texas Railway Company were tried to the court. The trial resulted in a judgment for plaintiff against each defendant for the amount of the award against it with interest and attorneys' fees. A similar judgment was subsequently entered in the cases not tried. The total amount of the judgments aggregated $181,190.87. Each defendant sued out a writ of error from the judgment against it, but by stipulation the cases are to be heard here on the record in the case of the Atchison, Topeka & Santa Fé. At the close of all the evidence the trial court was requested by counsel for defendants to declare the law as follows: (a) That upon all the evidence plaintiff was not entitled to recover against any or all of the defendants; (b) that there was not sufficient evidence before the commission to sustain its order of reparation.

At the trial the plaintiff to maintain the issues on his part introduced in evidence the report and order of the commission, dated January 12, 1914, in the case of Cattle Raisers' Ass'n of Texas v. Missouri, Kansas & Texas Ry. Co., No. 732 (not reported No. A–583). The order of reparation covered a period of time extending from August 29, 1906, the date when the commission received the rate-making power, under the Hepburn Amendment, to November 17, 1908, the date fixed by the commission when certain reduced rates should take effect. The commission had on August 16, 1905, in case No. 732, entitled as above, found that the rates established by the carriers for the transportation of cattle from certain points of origin in Texas, New Mexico, and Oklahoma to Kansas City, St. Joseph, and St. Louis, Mo., National Stockyards, Chicago, Ill., New Orleans, and other points, were unjust and unreasonable and in violation of section 1 of the Act to Regulate Commerce (11 Interst. Com. Com'n R. 298). After the taking effect of the Hepburn Amendment upon new pleadings the commission adhered to its former ruling and established rates for the future, effective November 17, 1908 (13 Interst. Com. Com'n R. 418). The report of the commission which was made a part of the reparation order had attached thereto appendix A, with the following heading:

| Consignor | Origin | Destination | Cars | Weight | Rate Paid | Rate Ordered | Amount of Refund | Interest |
|---|---|---|---|---|---|---|---|---|

The information contained in this appendix is explained by the report of the commission, which reads as follows:

"Prouty, Commissioner. The commission, in its former report in this case, 13 I. C. C. 418, 435, stated that reparation would be awarded from August 29, 1906. Claims for reparation were filed with the commission covering shipments both before and after this date, but no claims are embraced in this report where delivery was made previous to the date above given.

"These claims, as filed with the commission, describe in detail the shipments on account of which reparation is claimed, stating the point of origin and the point of delivery and the carrier making the delivery. By the direc-

tion of the commission, a list of the cars with respect to which claims have been filed was furnished to each one of these delivering lines, which was requested by the commission to check the claims against their records with a view to ascertaining how many of the cars moved as appeared from the records of the defendants. These claims have been checked by these delivering roads, and no carloads are embraced in this report which did not appear from the records of the defendants to have moved as stated.

"In all cases in this report the point of origin, the point of delivery, and the delivering road are named. The complainant has no way of determining the originating carrier, where the point of origin is served by two or more carriers, nor the intermediate carrier, where such a carrier participated in the transportation.

"These shipments of live stock were in all cases consigned to some person at the delivering market, usually a commission firm. The consignor paid the freight in the first instance to the delivering carrier in all cases. Subsequently the cattle were sold upon the market and the amount of the freight deducted from the purchase price, remittance being made for the balance. In all cases, therefore, the owner and shipper of the cattle finally paid the transportation charges.

"The table attached to and made a part of this report, as appendix A, shows with reference to all shipments whose movement was admitted by the defendants the point of origin, the point and road of delivery, the rate of freight which was paid, the rate which should have been paid, and the difference between the amount of freight which was paid and the amount which should have been paid. In some cases the weight of the shipment did not appear, and in all such instances the minimum carload has been applied, since under their tariffs, the carriers must have collected at least upon the minimum.

"Referring to appendix A, we find that the persons named in the column marked 'consignor' shipped from the points named in the column marked 'origin' to the points named in the column marked 'destination,' by the line of road named as the 'delivering road,' the number of cars specified in the column headed 'number of cars,' of the aggregate net weight stated in the column marked 'weight.' We further find that said shippers paid to said delivering carriers freight upon these shipments at the rate which is named in the column headed 'rate paid.' We find that this rate was unreasonable and excessive and that a reasonable rate to have been charged on the several shipments at the time they were made would have been that rate named in the column marked 'rate ordered,' which was subsequently established by the commission, and that therefore the said delivering carriers collected from the said shippers unreasonable charges on account of the shipments by the amounts named in the column headed 'amount of refund.' We further find that by these unreasonable exactions of the said carriers the said shippers were damaged in the amounts stated in said last-named column, since they received for their cattle less by those amounts than they would have received had the rate found reasonable been charged, and that said shippers are entitled to reparation in the amounts so specified, with interest from the date of the delivery of the shipment at 6 per cent., which said interest has been computed and is stated in the column marked 'interest.'

"In case of certain of the above claims the shipper made an assignment to H. E. Crowley, at that time secretary of the Cattle Raisers' Association. The form of this assignment was the same in all cases, and was as follows:

" 'In consideration of one dollar to me in hand paid by H. E. Crowley, secretary, as well as other considerations good and valuable to me, I hereby transfer and assign to him absolutely, any and all right of action, claims, or demands which I now have, or may hereafter have, against each and every railway company over whose railroad I have shipped any cattle, for reparation or reimbursements on account of any excessive, unreasonable, discriminatory, or otherwise unlawful or unjust freight rates or other charges which I have paid to such railway company on such shipments, as per schedule of said shipments hereto attached.

" 'Having assigned my said claim as aforesaid, I also delegate to said H. E. Crowley, secretary, full authority in establishing said claim to collect data and evidence in relation thereto from all commission companies, persons or firms as if I were personally present and acting in the premises.

" 'Witness my signature hereto.

" '.........................................  ⸳ ⸳  ⸳ ⸳  ⸳ ⸳ .........................

" '[Post office address.]                                    [Sign here.]'

"We find that this assignment was made by the shipper in all cases where, in appendix A, the name of such shipper is followed by the letter 'C.' Subsequently Crowley ceased to be secretary of the Cattle Raisers' Association and was succeeded by E. B. Spiller, and thereafter the shippers assigned certain other claims to Spiller. The form of assignment used was in all cases the same as that which had formerly been employed in making the assignment to Crowley. We find that those shippers whose names are followed by the letter 'S' made assignments in this manner to Spiller.

"After Crowley ceased to be secretary of the Cattle Raisers' Association he assigned all claims which had previously been assigned to him to his successor, Spiller, by assignment in due form, so that Spiller now has whatever right and title Crowley originally took under the assignments to him.

"The attorney for the complainant contended that all claims assigned to Spiller directly, or to Crowley and by him to Spiller as above, were so vested in Spiller that he was entitled to demand and receive payment of the amount of reparation due from the defendants, and that the order of reparation should be made in his favor. Upon the request of the attorney for the complainants the commission orders payment of reparation to E. B. Spiller in all cases where such assignments were made as indicated in the appendix aforesaid. Where no assignment has been made the order will run directly in favor of the owner as shown by said appendix.

"All the claims mentioned in the above appendix, with respect to which reparation is allowed, were filed with the commission within less than two years from the date when the shipment was delivered to the consignee by the delivering road.

"An order will be entered accordingly."

With the introduction of the report, order, and appendix, the plaintiff rested. Thereupon the defendant in support of the allegations of its answer introduced in evidence duly certified copies of the stenographers' notes of the hearings relative to reparation in case No. 732, Cattle Raisers' Ass'n of Texas v. Missouri, Kansas City & Texas Ry. Co. before Commissioner Prouty, at Chicago on September 19, 1912, January 24, 1913, and October 17, 1913. It was conceded by counsel for plaintiff that the freight money including the freight charge was apportioned between the carriers handling each shipment if more than one carrier was involved. A statement was also submitted by counsel for the Atchison, Topeka & Santa Fé Company showing the carriers who participated in the freight collected by said company, as shown by appendix A. It was also admitted that the Chicago, Rock Island & Pacific Railway Company, Chicago & Eastern Illinois Railway Company, Missouri, Kansas & Texas Railway Company, St. Louis, Iron Mountain & Southern Railway Company, and St. Louis & San Francisco Railway Company, were in the hands of receivers. This was all the evidence introduced at the trial below which in any way bears upon the questions raised. If there was not sufficient evidence introduced before the commission to sustain its order, then it necessarily follows there was no evidence to sustain the judgment below. As it is sought to sustain the order of the commission partly by the admissions and acquiescence of counsel for the railroads at the several

reparation hearings, it will be necessary at the expense of brevity to detail what transpired at said hearings. At the reparation hearing on September 19, 1912, Mr. Williams, assistant secretary of the Cattle Raisers' Association, was called as a witness for the claimant, and testified that he had applied during the previous four or five years or longer to certain commission houses for certain data in regard to shipments of cattle for which reparation was claimed, and from such data had prepared a statement or statements tabulating the claims for shipments of cattle made by members of the Cattle Raisers' Association and for whom said association had filed claims with the commission.

In order to explain the methods used in getting up the claims and tabulating them, the witness produced a statement of one J. H. Aikins, claimant, and testified that Mr. Aikins was a cattle dealer of quite a little prominence at Kansas City; that the witness understood that Mr. Aikins paid the charges; Aikins, however, did not handle the charges, as they were paid by the commission company for him. The witness was then asked:

"So these are really his cattle? A. Those are really his cattle; at least, that is the way the stuff was given to me."

Proceeding, the witness testified that it was his understanding that shipments of cattle were often billed in the name of the caretaker; understood that Lewis who appeared as shipper in the Aikens statement was a caretaker, but that Aikins owned the cattle; understood that the commission company received the cattle and paid the charges; supposed the Missouri, Kansas & Texas was the delivering line, at least that was the information furnished him; that the account in all cases was made out against the delivering line; was informed that the shipment was delivered by the Missouri, Kansas & Texas, and originated on that road. At this point Commissioner Prouty stated to counsel:

"Commissioner Prouty: I am inclined to think, gentlemen, that the only way in which this reparation can be made up is from the books of the carriers. I do not think you could make it up from the books of these commission men, although perhaps you may be able to do that. It seems to me if you can furnish the carrier with some starting point it would not be unreasonable to require the carrier to take these statements and check them up in lieu of requiring the production of the books and files or whatever might be necessary for examination."

"Commissioner Prouty: Never mind what may have been done; it seems to be conceded here that if we can get such information as will enable the railroads to trace these shipments that they will undertake the labor of tracing them and checking them, and we want to endeavor, if possible, to get that information."

Mr. Cowan, representing claimant, replied:

"Mr. Cowan: We have the original statements made by each commission company."

The witness Williams then testified that the Cattle Raisers' Association applied to the commission companies to make up a statement for each one of their customers showing to whom the shipments were made and the freight paid; that most of the commission companies complied with this request upon blank sheets furnished for that purpose; from these blanks so furnished, statements were compiled for

each shipper against each delivering line of railroad; that he obtained the amount of overcharge from a statement made by the tariff department of the commission, and from those figures compiled the amount that each shipper was entitled to on each carload; that in making up the minimum carload weight, 22,000 pounds was used instead of the exact weight, except in the cases of Morris & Co. and E. F. Swift, where the exact weights were obtainable. Witness understood that where freight was paid on a shipment of cattle it was paid by the commission company to the railroad and the amount deducted from the proceeds of sale, except in cases where freight was paid in advance. Witness understood that the caretaker, the man who goes along with the cattle as owner, signed the live stock contract or bill of lading with the carrier; the caretaker uses this contract for his return passage, and it is then returned to the auditor of the carrier without the name of the owner of the cattle on it. The contract shows the consignee, who is always the commission company. Witness then submitted a duplicate statement of the claims against each carrier and stated that he believed the amount of overcharge in each case to be correct. This tabulated statement was received in evidence. At this point the following conversation was had between Commissioner Prouty and counsel:

"Commissioner Prouty: Now, Mr. Cowan, just what do you claim for these papers you have introduced? Just what probative force do you claim? Do you claim that the introduction of those papers along with the testimony of Mr. Williams makes out for you a prima facie case?

"Mr. Cowan: I claim that it would make out a prima facie case if I would also bring before the commission or an examiner of the commission the evidence of the bookkeepers or persons in charge of the books of these commission companies to show that they compiled these claims correctly from their books, that they are books of original entry in the regular course of business.

"Commissioner Prouty: Now, do you claim that without the production of the books themselves?

"Mr. Cowan: I can be compelled probably to produce the books themselves before an examiner, were there any use of it, or the examiner of course could be present to hear the testimony of the bookkeepers. I do not see why the books themselves should be produced, but we have no objection to going to that trouble if it is necessary.

"Commissioner Prouty: Now, Mr. Norton (representing the Atchison), what do you say, and what do the other defendants say, as to the effect of the filing of these statements and as to the production of the books? Are you satisfied to accept the statements in lieu of the bookkeepers, and are you satisfied to accept the bookkeepers in lieu of the books?

"Mr. Norton: Speaking only for my own company, I think the evidence offered amounts to a failure of proof, and I should make a motion that the case be dismissed on that account. Mr. Cowan has had since 1906 to get this matter ready. I showed you this morning what slips were in possession of the stockyards people that were intelligible, and if they have been lost in the meantime he has been guilty of laches. There is an enormous amount of money involved here, and it seems to me the proof put up to us ought to be of such a nature that we can tell whether Mr. Jones did ship a carload of freight and whether he did pay for it. That is to say, whether he sustained damage by reason of this rate. Now, nothing of that sort has been given to us. The matter Mr. Cowan had filed from time to time I submitted to our auditor's office, and they said they could not check it at all. This matter which this witness puts in this morning is almost exactly the same sort of matter.

Therefore the question is put up to us of going to great expense and labor in order to prove a case against ourselves. That is what it amounts to."

"Mr. Cowan: I do not mean that this proof is complete, of course. It would require, in addition to what was proven by Mr. Williams, proof of the bookkeepers of the commission companies that the statements they made were correct.

"Commissioner Prouty: I think you would have to have the books of account themselves. My understanding is that the books of account are the evidence themselves, and not the testimony of some man as to what they contain."

The statements prepared by Mr. Williams being filed, counsel for claimant was directed to furnish copies of the same to each delivering carrier sought to be charged. The further hearing of the case was then adjourned to January 24, 1913. At this hearing Commissioner Prouty said:

"Commissioner Prouty: Let us see, in the first place, just what has been done by the carriers. You say you have served since the original hearing, or before that time, or since our last hearing and before that time, to each delivering line a list of the shipments with respect to which you claim to recover damages?"

Mr. Norton for the Atchison, Topeka & Santa Fé Railway Company, referring to a book containing 461 pages served by counsel for claimant upon his company, replied that the admissions were checked up by the auditor of the road with reference to the car movements and the amount of freight actually collected and as to these facts alone would he admit the correctness of the claimant's statement.

"Commissioner Prouty: Let us see just what the railroads do admit. Take this first item. This involves a shipment in the case of which Aaron & Hughes were the consignors. Somebody who may be termed 'E' was the consignee. It originated upon the Ft. Worth & Denver City Railway at Giles, Tex., and was shipped to destination No. 1, Kansas City, delivered on March 5, 1907. The shipment consisted of two cars. The rate paid was 34½ cents. The rate ordered by the commission was 31½ cents. The amount of the overcharge is $13.20. Now, the admission of the carriers would apparently show that somebody made a shipment, Aaron & Hughes perhaps made a shipment on that date and paid that rate, and are entitled to the $13.20. Do you concede, Mr. Norton, that Aaron & Hughes paid the $13.20?

"Mr. Norton: No, all that we show by that is that this car did move as stated, and that we collected there the amount specified in Mr. Cowan's sheet, or else some additional amount.

"Commissioner Prouty: Apparently you concede there that you collected the amount specified by Mr. Cowan?

"Mr. Norton: Yes.

"Commissioner Prouty: Now, it is necessary, in addition to that, for the commission to find, before it makes an order, that some individual paid that freight. Mr. Cowan, do you claim that the admission of the railroad company shows that Aaron & Hughes paid that freight?

"Mr. Cowan: Well, I do not know that I claim that the admission of the railroad is to that effect, but it would seem necessarily so, because we are prepared to prove that in all cases, without exception, there is charged up in the account sales by the commission company the amount of the freight, and that is taken out and deducted from the receipts for the cattle when sold."

## Commissioner Prouty, addressing Mr. Williams, said:

"Commissioner Prouty: Where do you get your information which you put at the top of the sheet, showing the owner?

"Mr. Williams: From data furnished by the commission companies.

"Commissioner Prouty: Are there a good many cases where the name of the claimant is not the same as the name of the shipper or consignor?

"Mr. Williams: I hardly know. I suppose there are a good many; I do not remember right now, but I think in all cases they are shown as the consignor in the headings there. We tried to make that the name of the party in whose name they were shipped, so the railroads could more easily check them up."

Commissioner Prouty then said that he was of the opinion that, in addition to the checking, there must be proof as to who paid the freight. Mr. Dickinson, representing the Chicago, Rock Island & Pacific Railway Company, stated that his company had checked over the statement of claimant and found it reasonably accurate. Commissioner Prouty then said:

"Commissioner Prouty: Assuming that you do locate a particular shipment, so you are satisfied that the shipment moved and the freight money was paid by somebody, do you intend to question the fact that the money was paid by the consignor ultimately? I understand the course of business to be that these cattle are sold on the market by some commission men, and the freight money is paid by the commission man and deducted from the amount received from the sale of the cattle and the balance remitted to the owner, which of course amounts to a payment by the owner. Do you make any question that the consignor did in that way pay this freight?"

Mr. Dickinson said in reply:

"I understand that that is the course of business as practiced at the terminal markets at Kansas City and Chicago. Whether there are any exceptions I am not informed. Now, as to the party to whom the money is remitted, that is after this freight has been deducted from the selling price of the cattle, I have no advice on that at all."

Commissioner Prouty then, addressing Mr. Wright, representing the St. Louis, Iron Mountain & Southern, said:

"Do you make any question as to the right of the consignor to cover those overcharges, or rather that he is to be found to be the person who paid the overcharge?"

To which Mr. Wright replied:

"We admit that the freight charges were paid, and believe that the statements as rendered by Mr. Cowan are substantially correct, although as to who are the consignors there is some question. There are one or two cases in our list where we find a different consignor entirely from what Mr. Cowan stated. We find that the shipment was made from the point stated via the lines stated and delivered on the date, but an entirely different consignor."

Then Mr. Prouty, addressing Mr. Fletcher, who represented the Illinois Central, said:

"Commissioner Prouty: Now, Mr. Fletcher, are you disposed to question the fact that the claimant, or the person named as claimant, in these cases paid the freight?

"Mr. Fletcher: We are without any information at all on that.

"Commissioner Prouty: Suppose the books of the commission man show that the remittance was made to that individual.

"Mr. Fletcher: Without committing myself now, which I cannot be expected to do without reflection, it would seem to me, if the books of the commission merchant showed the payment by the shippers, or owners, and there could be sufficient information to identify that with these things here, it would all have to be proved as to whether the books referred to the same shipments here shown, I would say that would be competent evidence. Whether it would establish it or not, I would not undertake to say now."

At this time Commissioner Prouty stated to counsel for the railroad companies if they deemed it of any advantage to have the order entered against each of the lines participating in each shipment, and would furnish the commission the necessary information so that the commission might know by what means the shipment moved, the commission would make the order in that way, but unless such information was furnished the order would go against the delivering line. This was said to all the carriers.

Mr. Williams further testified that his information in the main was furnished by the commission companies, and in some instances came from the parties themselves. Commissioner Prouty then said to Mr. Burg, representing the Missouri, Kansas & Texas:

"Commissioner Prouty: And what do you say as to the proof required to show that the claimant has paid this freight? Is your company familiar with the manner in which this business is done?

"Mr. Burg: Not at all; at least, I am not."

Then Commissioner Prouty stated to Mr. Cowan:

"Commissioner Prouty: As soon as you have done all you can toward checking these with the railroads, you will notify the commission, and we will at once have the examiner go to work for the purpose of stating these accounts. I suppose in doing that it will be necessary for him to do part of his work in Chicago, where the books of the commission merchants are, and part in Kansas City, and perhaps part in St. Louis.

"Mr. Cowan: Yes, it will have to be done. There are a very small number in Chicago, but mainly in St. Louis and Kansas City."

The hearing was then adjourned. At the hearing on October 17, 1913, Mr. Williams produced a tabulated statement, practically the same as Exhibit A attached to the report of the commission, and hereinbefore referred to. It was called "Exhibit A" at the hearing. Commissioner Prouty referring to the tabulated statement then said to Mr. Williams, the witness:

"Commissioner Prouty: They show here certain cars, they show the date of the shipment, the initial of the car, and so forth. Do those cars correspond to the detailed statement which you filed? In other words, can you identify 135 of the cars with respect to which you filed a claim, as those 135 cars?

"Mr. Williams: I have not attempted to identify them that way. I took it for granted that they acknowledged those claims by furnishing us with this information, when we filed it with them."

Commissioner Prouty then said to the witness:

"Now, have the other roads, which you say have checked up these cars, done it in the same way or with the same detail?

"Mr. Williams: Most of them have; some have not. The Katy furnished a checking and they gave no waybill references or car numbers, nor did the Frisco."

Mr. Prouty then said to Mr. Andrews, representing the Atchison, Topeka & Santa Fé:

"Commissioner Prouty: Mr. Andrews, do you make any question as to the movement of the cars and the correctness of the statement as made by the complainant, or as verified by you with respect to those cars which you checked?

"Mr. Andrews: We do not make any admission excepting that the cars moved. That is all our checking is supposed to show; it shows on its face.

"Commissioner Prouty: Your check shows they moved from a certain point to a certain point, and that certain freight was paid?

"Mr. Andrews: We did not make any endeavor excepting to see that the cars moved, is all.

"Commissioner Prouty: And moved under the name which appears in the statement checked you?

"Mr. Andrews: I don't understand that the consignor or consignee were checked up. They show on their face. The understanding I have about it from our auditors is that they made a complete check of the movement of the cars, and the weights, etc.; but I do not think they ascertained who the shippers were.

"Commissioner Prouty: I suppose they made no ascertainment beyond the billing, but they must have checked those against the billing.

"Mr. Andrews: I don't know as to that.

"Commissioner Prouty: Do you make any question about the right of the complainant to an order for reparation as to these cars which you admit moved?

"Mr. Andrews: Why, excepting that they have not shown that they were the shippers. That is a matter that we do not admit. We take the position, also, that they have not made any special proof of damage.

"Commissioner Prouty: I understand that, but you admit that they. paid the freight?

"Mr. Andrews: . No, we do not admit that.

"Commissioner Prouty: You admit that somebody paid the freight?

"Mr. Andrews: No, we admit that the cars moved, and that so much was collected on each car.

"Commissioner Prouty: Somebody must have paid you the freight?

"Mr. Andrews: But we do not admit that the claimants paid the freight.

"Mr. Cowan: If your honor please, I do not believe in that qualified admission. There comes in here one time one man who represents the Santa Fé, and there comes in next time another man who represents the Santa Fé.

"Commissioner Prouty: I think we will find on the strength of these statements here that the freight was paid to the commission man and by him charged over against the owner, whose name appears on these cars that have been checked.

"Mr. Cowan: In all cases we furnished the name of the owner who paid the freight.

"Commissioner Prouty: Yes, I understand that.

"Mr. Cowan: They know that. It is a mere quibble to talk about not knowing who paid the freight. The man who owned the cattle paid the freight.

"Now, Mr. Williams, will you please get one of the original—

"Commissioner Prouty: Just wait a minute, Mr. Cowan. Do you make any question on the part of the Santa Fé in case the commission ·finds these cars were shipped by the persons who make the claim, who appeared on the way-bills as the owners, and the freight was paid by that person—do you make any·objection to the issuing of an order of reparation at this time with respect to those claims?

"Mr. Andrews: We do, on the ground that they have not shown damage.

"Commissioner Prouty: Yes, I understand that that ground is always raised. They have shown damage to this extent, that they paid a higher rate than the commission found reasonable. It is a legal question as to whether that is damage.

"Mr. Andrews: Yes, but we do not admit that these claimants are entitled to or paid the freight.

"Commissioner Prouty: I am asking you, in case the commission finds that fact, do you make any objection to an order for reparation?

"Mr. Andrews: Excepting that we do not admit that they have suffered damage.

"Commissioner Prouty: To make my question more specific: Here are 173 cars claimed by Mrs. Adair. You admit the movement of 135. Do you object to the issuing of an order with respect to those 135 cars before the question as to the remaining cars is determined?

"Mr. Andrews: We object to it on the ground that the claimants have not shown that they were damaged.

"Commissioner Prouty: Oh, well; as Mr. Cowan says, this Santa Fé Railroad should send in some one here that knows something about this case. That is not the question I am asking you. Suppose we find that they are damaged as to 135 cars. Have you any objection to an order issuing as to those 135 cars before the question has been considered as to the remaining cars? They make claim as to 173 cars?

"Mr. Andrews: Of course, we will not object to an order on that basis.

"Commissioner Prouty: That is, you have no objection to the order being split in two pieces?"

"Mr. Andrews: No, sir."

Then Commissioner Prouty said to Mr. Burg, representing the Missouri, Kansas & Texas Railroad Company:

"Commissioner Prouty: Do you understand that Mr. Williams' statement is correct, Mr. Burg?

"Mr. Burg: Substantially correct, Mr. Commissioner. Of course, we only checked those statements with reference to the movement of the cars; we did not check the freight rates.

"Commissioner Prouty: Now, Mr. Burg, have you any objection to the issuing of an order as to the claims for the cars which have been found by you to have been actually moved, provided the commission finds such other facts as it thinks warrants the issuing of an order?

"Mr. Burg: Mr. Commissioner, I see no substantial objection to that. The only thought I have in mind is this, perhaps the commission's order would go into litigation, and by issuing the order in piecemeal it might increase our expenses of litigation. But I do not see that it would make any substantial objection to it."

Mr. Humburg, representing the Chicago & Eastern Illinois Railroad Company, was called on by the commissioner to show what he admitted, if anything. Mr. Humburg said:

"This matter, if your honor please, has been handled by Judge Fletcher, who is out of the city to-day. But in going through the files I find a letter addressed to Mr. Williams under date of January 23, 1913, saying the shipments have been checked and found to be substantially correct. That there are some minor irregularities in the names of consignors, but these are apparently only such errors as arise from frequent transcriptions of waybills.

"Commissioner Prouty: You are of the opinion, then, that the checking is sufficient to identify these cars as having moved?

"Mr. Humburg: Our position upon that matter, if your honor please, is that the statement we have submitted to Mr. Williams will speak for itself. Beyond that we do not know what the situation is. That is to say, we do not know of our own knowledge who finally bore the charges; and we urge, in substance, the motion to dismiss filed with the commission on the ground shown in that motion.

"Commissioner Prouty: Now, Mr. Cowan, it is a long time since I have practiced law, but my recollection is that there is a legal maxim that every claim which can be embraced in a judgment is presumably embraced, so that a judgment upon an account covering a certain period is a bar to every claim during that period, whether the item was actually embraced or not. I do not see any reason for objection, in fact, it seems to me there is every reason for the court's position, and I do not see any objection to the issuing of an order with respect to these claims as to which the movement is admitted, an opportunity to try the matter out in court, and, if it is decided you can recover, you can then proceed to make proof as to the balance, which may be a matter of some difficulty, and it would not be worth while to take up your time and the time of the defendants to make that proof unless some good would come from it. At the same time, you must assume the responsibility, if you ask the commission to make that kind of an order.

"Mr. Cowan: I want to take an order for the claims that have been admitted. I want to take a chance.

"Commissioner Prouty: You understand there has not been anything admitted; that is to say, these railroads have not admitted you are entitled to any money. They have admitted the movement of certain cars, and they earnestly insist you are not entitled to recover; but I think the commission would find on the facts admitted that you have paid the freight and are entitled to reparation. We hold that the payment of an unreasonable charge imports damage, that of itself shows damage. Now, the railroads claim to the contrary, and are going to try that question."

"Commissioner Prouty: I might say that, if Mr. Williams can attend to this, I will ask our examiner to sit down with him immediately, just as soon as he comes to Washington, and go through these checks of the railroads and see what are admitted, so we can make up a statement based on that admission. If within the next few days you can file with the commission and serve on the defendants a statement of what you ask to have found, that might be of service to us in rendering our findings, leaving out the exact figures; a statement of facts.

"Mr. Cowan: I think, your honor, we have anticipated that by the very complete statement Mr. Williams has made alphabetically of the claim or every person against each railroad, which we would be glad to furnish, of course, to each railroad, I guess you have copies, Mr. Williams. He can furnish copies, and it shows a tabulated and convenient statement.

"Commissioner Prouty: There is one thing more; these shipments were made and the freight paid by a great many different persons. My understanding is that there has been some sort of an assignment of these claims to the secretary of the Cattle Raisers' Association or to the Cattle Raisers' Association. Now, do you ask the commission to make the order in favor of the original shipper, or do you ask the commission to make it in favor of the assignees, and, if so, what evidence do you offer of the fact of the assignment?"

"Mr. Cowan: My position is this, as I have shown by Mr. Williams this morning, and if it is not sufficiently shown we can have him testify further on the subject, or any commission man in Chicago will testify to the fact, and all the railroads know it, that by the universal custom the commission man pays the freight, which is done, I will say, in all cases. There might be a case in a thousand where it is not done. He is also the agent to collect back overcharges.

"Commissioner Prouty: Suppose we assume that the commission man did pay the freight and did charge it to the owners. That results in the owner ultimately paying the freight. The owner got so much less for his stuff than if the freight had been lower. That constitutes a claim from the owner?

"Mr. Cowan: It constitutes a claim from the owner, but by the universal custom of the defendants the commission company is the agent of the owner to pay the freight, and to collect back overcharges."

Commissioner Prouty stated that he did not think the mere filing of an assignment, unless counsel had consented to it, without an opportunity to examine it, would be sufficient. Then Mr. Cowan interrogated the witness Williams and asked the witness if he knew as a matter of fact that written assignments had been made and filed with the Cattle Raisers' Association and were in his office. Mr. Williams answered: "Yes, sir." The witness was then asked is it not a fact that "Mr. Crowley, when he retired or since he retired as secretary of the association, assigned over to Mr. Spiller all the claims which had been assigned to Mr. Crowley?" The witness: "Yes, sir." Mr. Cowan: "That is a written assignment?" Witness: "Yes, sir." Mr. Cowan then said: "These assignments were taken for nominal considerations because the Cattle Raisers' Association was prosecuting

these cases, and the secretary and general manager, being in one office, had charge of the whole matter." Witness: "Yes, sir." The blank form in the commission's report purported to be that of Mrs. Adair.

Then the following conversation was had between Commissioner Prouty and Mr. Cowan:

"Commissioner Prouty: You let us know right away, Mr. Cowan, whether you want the order made, if one is made, in favor of the original owner, or in favor of the assignee.

"Mr. Cowan: I want it in favor of the assignee, in all cases where we have an assignment. We have considered the matter quite thoroughly, and we think, and I will brief that point and submit it to the commission, that we are entitled to the order on behalf of the manager.

"Commissioner Prouty: I do not care to have you brief it; you will have to assume the responsibility in making it. You have the thing all mixed up here so I would not have any idea what ought to be done, so you make up your mind what form you think the order ought to take, and we will put the order in that form.

"Mr. Cowan: If your honor was going to stay on the commission, I might not remark that I do not think you ought to say we have the thing all mixed up; I think it is rather pertinent.

"Commissioner Prouty: I hope it is as plain to my successor as it is to you.

"Mr. Cowan: I will submit and be very glad to furnish counsel on the other side my conclusions on that subject. As I said, my partner is a very good lawyer, and when we can get together, which will be very shortly, I will get him to make up an opinion on this point.

"Commissioner Prouty: Now, of course, there is no proof here that these assignments have been executed by the persons who purport to execute them; but I take it, gentlemen of the defense, it would not be your desire to put Mr. Cowan to the necessity of making proof in each individual case. There is no doubt about it, I suppose, and we will find, unless there is some objection, that this assignment was regularly made by the person purporting to execute it."

### Mr. Dickinson then said:

"Mr. Dickinson: I would like to suggest that it may be true, as far as my knowledge goes, that there is a universal custom of the commission houses to deduct freight charges from the invoice and remit the balance to the consignor; but I do not feel at liberty to admit the sufficiency or the competency of the proof that has so far been offered to sustain that proposition in this case.

"Mr. Cowan: How should I be able to prove it if it is a fact? Do you want somebody from a commission house that is thoroughly familiar with it?

"Mr. Dickinson: Of course, I am not making the proof. I do not think it would be right for me to sit here silently, and by my silence admit that you have proved that fact, so far as you have proceeded in this case.

"Mr. Cowan: If there is a question about that, I see Mr. Clifford Thorne, who is the chairman of the Iowa Commission, here, and who I think is thoroughly familiar with live stock transactions in this country.

"Commissioner Prouty: I do not believe, Mr. Cowan, that would be altogether competent proof. I rather think you have shown it already; but the testimony of one man in one section of the country that a certain thing was done in Iowa would hardly show that it was done in Texas."

"Commissioner Prouty: We will look over the record in that respect, but my impression is the commission will find from the present record that the owner paid the freight. He sent the cattle to market, sent them to a commission man, and in the ordinary course of business he paid the freight."

The commissioner then said to Mr. Cowan that he need not introduce any testimony as to what the ordinary course was with the commission companies in paying the freight. All through the hear-

ing the record shows that every one understood, from the statements of counsel for the claimant and the commissioner, that a man from each commission company would be produced, who would in the presence of counsel testify to the accuracy of the books of the commission company as to who paid the freight and what the custom was, if any, until the commissioner said that it was unnecessary as the railroads had admitted the correctness of the claims. There was no dispute on the reparation hearing or at the trial below, but that the commission had condemned the rate between the points of origin and the several markets heretofore mentioned. What we have stated covers all the evidence that was before the commission to sustain its order. It is true counsel for plaintiff say there were trunks full of other evidence, but it appears conclusively that there was no other evidence introduced than as above stated.

[1-3] In approaching the consideration of the questions raised by the assignments of error, we are not unmindful that, in making inquiry pertaining to interstate commerce, the commission should not be too narrowly constrained by technical rules as to the admissibility of proof, nor hampered by those narrow rules which prevail in trials at common law. I. C. C. v. Baird, 194 U. S. 44, 24 Sup. Ct. 563, 48 L. Ed. 860. In I. C. C. v. L. & N. R. R. Co., 227 U. S. 93, 33 Sup. Ct. 185, 57 L. Ed. 431, however, it was said at page 91 of 227 U. S., at page 186 of 33 Sup. Ct., 57 L. Ed. 431:

"In the comparatively few cases in which such questions have arisen it has been distinctly recognized that administrative orders, quasi judicial in character, are void if a hearing was denied; if that granted was inadequate or manifestly unfair; if the finding was contrary to the 'indisputable character of the evidence' (Tange Tun v. Edsell, 223 U. S. 673, 681 [32 Sup. Ct. 359, 56 L. Ed. 606]; Chin Yoh v. United States, 208 U. S. 8, 13 [28 Sup. Ct. 201, 52 L. Ed. 369]; Low Wah Suey v. Backus, 225 U. S. 460, 468 [32 Sup. Ct. 134, 56 L. Ed. 1165]; Zakonaite v. Wolf, 226 U. S. 272 [33 Sup. Ct. 31, 57 L. Ed. 218]); or if the facts found do not, as a matter of law, support the order made (United States v. B. & O. S. W. R. R., 226 U. S. 14 [33 Sup. Ct. 5, 57 L. Ed. 104]). Cf. Atlantic C. L. v. North Carolina Corp. Com., 206 U. S. 1, 20 [27 Sup. Ct. 585, 51 L. Ed. 983, 11 Ann. Cas. 398]; Wisconsin, M. & P. R. Co. v. Jacobson, 179 U. S. 287, 301 [21 Sup. Ct. 115, 45 L. Ed. 194]; Oregon Railroad v. Fairchild, 224 U. S. 510 [32 Sup. Ct. 535, 56 L. Ed. 863]; I. C. C. v. Illinois Central, 215 U. S. 452, 470 [30 Sup. Ct. 155, 54 L. Ed. 280]; Southern Pacific Co. v. Interstate Com. Comm., 219 U. S. 433 [31 Sup. Ct. 288, 55 L. Ed. 283]; Muser v. Magone, 155 U. S. 240, 247 [15 Sup. Ct. 77, 39 L. Ed. 135]."

At page 92 of 227 U. S., at page 187 of 33 Sup. Ct., 57 L. Ed. 431:

"But the legal effect of evidence is a question of law. A finding without evidence is beyond the power of the commission. An order based thereon is contrary to law and must, in the language of the statute, 'be set aside by a court of competent jurisdiction.' 36 Stat. 551."

At page 93 of 227 U. S., at page 187 of 33 Sup. Ct., 57 L. Ed. 431:

"But the more liberal the practice in admitting testimony, the more imperative the obligation to preserve the essential rules of evidence by which rights are asserted or defended. In such cases the commissioners cannot act upon their own information, as could jurors in primitive days. All parties must be fully apprised of the evidence submitted or to be considered, and must be given opportunity to cross-examine witnesses, to inspect documents, and to offer evidence in explanation or rebuttal. In no other way can a party main-

tain its rights or make its defense. In no other way can it test the sufficiency of the facts to support the finding; for otherwise, even though it appeared that the order was without evidence, the manifest deficiency could always be explained on the theory that the commission had before it extraneous, unknown but presumptively sufficient information to support the finding. United States v. Baltimore & Ohio S. W. R. R. Co., 226 U. S. 14 [33 Sup. Ct. 5, 57 L. Ed. 104]."

[4, 5] This case was followed and approved in Florida East Coast R. Co. v. United States, 234 U. S. 167, 34 Sup. Ct. 867, 58 L. Ed. 1267, and Philadelphia & Reading R. Co. v. United States, 240 U. S. 334, 36 Sup. Ct. 354, 60 L. Ed. 675. Meeker & Co. v. Lehigh Valley R. Co., 236 U. S. 412, 35 Sup. Ct. 228, 59 L. Ed. 644, Ann. Cas. 1916B, 691, was a suit to recover an award of damages made by the commission for violation of sections 1 and 2 of the Act to Regulate Commerce. The Supreme Court in this case decided that the statute regulating the procedure of the commission in making an award of damages (sections 14 and 16) required "a finding which, as applied to the present case, would disclose (1) the relation of the parties as shipper and carrier in interstate commerce; (2) the character and amount of the traffic out of which the claims arose; (3) the rates paid by the shipper for the service rendered and whether they were according to the established tariff; (4) whether and in what way unjust discrimination was practiced against the shipper from November 1, 1900, to August 1, 1901; (5) whether, if there was unjust discrimination, the shipper was injured thereby, and, if so, the amount of his damages; (6) whether the rate collected from the shipper from August 1, 1901, to July 17, 1907, was excessive and unreasonable, and, if so, what would have been a reasonable rate for the service; and (7) whether, if the rate was excessive and unreasonable, the shipper was injured thereby, and, if so, the amount of his damages."

The above excerpt was quoted and approved in Mills v. Lehigh Valley R. R., 238 U. S. 477, 35 Sup. Ct. 888, 59 L. Ed. 1414. It follows as a matter of course if these findings are required in order that the commission may make an award of damages they must be supported by evidence. Penna. R. Co. v. International Coal Mining Co., 230 U. S. 184, 33 Sup. Ct. 893, 57 L. Ed. 1446, Ann. Cas. 1915A, 315. The law required that the suit in the court below should proceed in all respects like other civil suits for damages, except that on the trial the findings and order of the commission were prima facie evidence of the facts therein stated. Section 16 of the act; Meeker & Co. v. Lehigh Valley R. Co., 236 U. S. 412–434, 35 Sup. Ct. 328, 59 L. Ed. 644, Ann. Cas. 1916B, 691; Missouri Pacific Ry. Co. v. C. E. Ferguson Sawmill Co., 235 Fed. 478, 149 C. C. A. 20; Western New York P. R. Co. v. P. Refining Co., 137 Fed. 343, 70 C. C. A. 23.

[6] With the above well-established principles in mind, we approach the consideration of the evidence, including the admissions and the so-called acquiescence of counsel for the carriers, which it is claimed justified the findings and order of the commission. As to the admissions of the carriers, the report of the commission reads:

"These claims, as filed with the commission, describe in detail the shipments on account of which reparation is claimed, stating the point of origin and

the point of delivery and the carrier making the delivery. By the direction of the commission, a list of the cars with respect to which claims have been filed was furnished to each one of these delivering lines, which was requested by the commission to check the claims against their records with a view to ascertaining how many of the cars moved as appeared from the records of the defendants. These claims have been checked by these delivering roads, and no carloads are embraced in this report which did not appear from the records of the defendants to have moved as stated."

We also find the following statement in the brief of counsel for plaintiff:

"It (the record) shows conclusively that all claims shown in appendix A were checked by the railroads, and they admitted the movement of the cars as claimed, and that the excess freight was paid. By whom paid was not admitted and that the shippers were damaged was not admitted."

We think the statements in the brief and report are rather broad in regard to the admissions of the carriers as these admissions appear in the record. Some of the carriers admitted that some of the cars mentioned in the tabulated statement furnished them had moved as stated and that the freight mentioned in the statement had been collected. This is as far as the admission goes as shown by the record; but conceding that the admissions went as far as the commission claims in their report and as counsel claim in their brief, still the case was left far from being proven. There is no warrant for claiming that the admission that certain freight moved and the freight thereon was collected made a case upon which the commission could award damages against the carriers, and these admissions are all the legitimate proof upon which the order of the commission must stand or fall.

The plaintiff was prosecuting the claims for reparation before the commission as the assignee of an owner of cattle who had shipped the same, paid the unreasonable freight rate, and thereby was injured and damaged. It was therefore necessary for the plaintiff to show who the owner was, that he paid the unlawful rate, and was damaged thereby and the extent thereof. The claim was not for an overcharge or extortion, but for damages. In every instance where the act authorizes the commission to make a pecuniary award the word "damages" is used. It is said in the report of the commission:

"These shipments of live stock were in all cases consigned to some person at the delivering market, usually a commission firm. The consignee paid the freight in the first instance to the delivering carrier in all cases. Subsequently the cattle were sold upon the market and the amount of the freight deducted from the purchase price, remittance being made for the balance. In all cases, therefore, the owner and shipper of the cattle finally paid the transportation charges."

With reference to this finding it may be said that there was no proof before the commission that a single owner of cattle mentioned in appendix A shipped cattle over the carriers' lines and paid the unlawful rate. There was no evidence that the consignee mentioned in appendix A paid the freight in the first instance to the delivering carrier, and that subsequently the cattle were sold upon the market and the amount of the freight deducted from the purchase price; remittance being made for the balance to the owner. There was talk back and forth between the commissioner conducting the reparation hear-

ings and counsel as to some custom of the commission houses along the lines suggested; but there was no proof of such custom, and counsel for the carriers, when interrogated by the commissioner in reference thereto, disclaimed any knowledge of such a custom. Counsel for plaintiff stated at the reparation hearing that he was ready to prove such a custom, but the commissioner finally concluded that it was unnecessary as the carriers had admitted the claims. The evidence in our opinion wholly fails to show who owned the cattle shipped, or who paid the freight. There was no proof that the consignors mentioned in the tabulated statement, now called appendix A, were the owners of the cattle, and it appeared beyond dispute by the testimony of the only witness sworn, that the cattle were not in all cases shipped in the name of the owner, but in the name of the caretaker. The extent to which the admissions of the carriers carried the plaintiff's case is not disputed. The only other proof that by any pretense may be claimed to show that any owner of cattle shipped them over the carriers' lines and paid the unlawful rate is the testimony of the witness Williams, who testified that during four or five years he had obtained from the commission houses and other sources "stuff" as he calls it, showing the shipment of cattle, not by the owner, and therefore damaged by the payment of the unlawful rate, but simply that a certain person shipped cattle.

[7-9] Of course, this testimony was the worst kind of hearsay, but counsel claims that it was unobjected to, and therefore in an appellate court the objection that it was hearsay cannot be made. We are of the opinion, if the proceedings before the commission are allowed to be conducted in an informal way, so far as the commission is concerned counsel engaged in the conduct of such proceedings are not required to preserve and protect their rights with the watchful nicety that would be required in courts of justice. Moreover, the record shows in many places where counsel asserted that there was an entire failure of proof, and demanded that the proceeding should be dismissed, so that it cannot be said that counsel acquiesced in the proposition that the tabulated statement, together with the admissions of the carriers, proved a case for damages against them. Again, we are not sitting for the purpose of reviewing errors in the admission or rejection of evidence. If we were and the case was an action at law, some exception and a ruling thereon by the court below would be necessary; but the question before us is whether there was any substantial evidence before the commission to justify its order. Such an inquiry permits us to consider the character of the evidence introduced to support the order. 4 Chamberlayne on Evidence, § 2702.

[10, 11] As we have said, the claim for reparation was made by Spiller as assignee of the cattle owner. It was therefore necessary for him to show such an assignment of the claims as would vest him with the legal title thereto if the award was to be made to him. The record shows that some of the claims if assigned at all were assigned to Crowley, others to Spiller, other still, and it did not appear which ones, were simply placed with the Cattle Raisers' Association for collection, and it stands undisputed that, whether assigned or placed in the hands of the association for collection, the only purpose of the

assignment or placing for collection was to enable the Cattle Raisers' Association to handle the claims for reparation. On the undisputed evidence, therefore, the legal title to the claims for reparation never vested in Spiller, and the commission was wholly without authority to cause the order of reparation to be made to him. He was not a shipper or owner of cattle, and of course was not injured through any act of the carriers. The commissioner conducting the hearing was much in doubt himself as to whom the order of reparation should be made, and the report of the commission states that it was made to Spiller because his counsel so requested, being willing to take a chance.

At the reparation hearing Mr. Cowan stated that he had the assignments of a large number of claims, which he would submit to the commission; that there were some claims not covered by assignments; and that the firm of which Mr. Cowan was a member was of the opinion that when the commission companies demanded that the claims be filed for their customers, whether they were members or not of the Cattle Raisers' Association, this was sufficient authority for Mr. Crowley and Mr. Spiller to proceed and file claims where there was no criticism of the assignment; and that, while perhaps the order of the commission ought to be made in the name of the owner of the claim, counsel thought the agency was sufficiently proven to entitle them to collect the claims.

After the statement of counsel, the commissioner said:

"There is no proof here that these assignments have been executed by the persons who purport to execute them, but I take it, gentlemen of the defense, it would not be your desire to put Mr. Cowan to the necessity of making proof in each individual case. There is no doubt about it, I suppose, and we will find, unless there is some objection, that this assignment was regularly made by the person purporting to execute it."

The remarks of the commissioner related only to the assignment of the claim of Mrs. Adair. In connection with the claimed acquiescence of counsel for the railroad companies, it may be said that we are of the opinion that, when a carrier is cited to show cause why it should not be adjudged to pay damages for collecting an unjust rate, it cannot be so adjudged by being told if no objection is made the commission will proceed and award them. Therefore the failure of counsel in this case to object to what the commissioner proposed to do in regard to the assignments does not now estop them from claiming that there was no proof of the assignment of the claims mentioned in appendix A. The witness Williams in the very nature of things could not know that over 2,000 shippers and claimants had assigned their claims to Crowley and Spiller. Our conclusion is that there was not sufficient evidence to support the finding of the commission, that the claims had been legally assigned to Spiller, and that, conceding there was, the evidence showed that the purpose of the assignment was not such as to vest the legal title of the claims in Spiller so as to authorize the commission to make the award of damages to him.

[12-15] We now reach the question as to whether there was any proof that any owner of cattle who shipped cattle and paid the unlawful rate, assuming that such fact had been shown, was damaged thereby. It appears from the report of the commission, assuming that

their findings on other branches of the case are correct, that the damages that each shipper suffered was arrived at by computing the difference between the unlawful rate condemned and the rate ordered in by the commission without any other proof than the mere shipment of the cattle and the payment of the freight. Was this the legal measure of damages? Some general observations may be made at the outset as to the general result to which the action of the commission would lead. By section 15 of the act as amended in 1906, the commission was "hereby authorized and empowered to determine and prescribe what will be just and reasonable individual or joint rate or rates, charge or charges, to be thereafter observed  *  *  *  for such period of time not exceeding two years, as shall be prescribed in the order."

In granting reparation based entirely upon the difference in rates, the commission instead of establishing a rate for the future for a period not exceeding two years, established a rate for 4 years, 2 months, and 21 days. The commission, in Arlington Heights Fruit Exchange v. S. P. Co., 39 Interst. Com. Com'n R. 88 (93), decided that to award reparation for the period between the date of service of an order establishing a rate for the future and its effective date would, in substance, be to disregard the statutory restriction that orders establishing rates for the future should not go into effect less than thirty days from the date of service of the order. The principle involved in this decision is that to grant reparation based alone upon the difference in rates is to put the rate into effect. Again, it must be presumed, in the absence of any evidence to the contrary, that the carriers involved in this litigation honestly and in good faith established the rate condemned by the commission, as just and reasonable, yet although they exercised an honest judgment they must pay damages. The case would be different if it arose from a violation of section 2, denouncing favoritism, section 3, denouncing discrimination, or section 4, prohibiting a lesser charge for a longer haul, for under each of the last-mentioned sections the carrier would know when it violated the law. It was bound to know the law, and the facts were within their own knowledge. Further, whether the carriers established an unreasonable and unjust rate is still open in this very action to the consideration of a jury, and, if all these shippers had obtained separate orders of reparation, there might be as many diverse verdicts upon the question of reasonableness of the rate as there were cases. These suggestions give rise to the inquiry as to whether reparation based on the difference in rates is lawful under section 1. Certainly all the evils that were depicted by the Supreme Court in the Abilene Oil Case, 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075, are possible to arise in the practice of granting reparation under section 1, based upon the difference in rates. The rate condemned was the legal rate, binding upon both the carrier and the shipper. Atchison, T. & S. F. Ry. Co. v. Robinson, 233 U. S. 173, 34 Sup. Ct. 556, 58 L. Ed. 901. Manifestly, the shipper could not sue in a court of law to recover back any portion of the legal rate. Van Patten v. Chicago, etc. (C. C.) 81 Fed. 545. Can the commission accomplish the same thing by awarding damages based on the difference in rates alone? The grant of power, however, to the Interstate Commerce Commission to award reparation for any violation

of the act is broad and comprehensive, and the objections stated are rather to the manner and form of granting reparation under section 1, than to the power of the commission to grant reparation at all.

The case of Penna. R. Co. v. International Coal Mining Co., supra, was a suit to recover damages by reason of the defendant railroad company's having two rates for the shipment of coal, a rate for "free coal" and a rate for "contract coal." Under this practice, where coal had been sold for future delivery the carrier collected the published tariff rate and rebated the difference between it and the lower rate enforced when the contract of sale had been made. The coal company proved that between April 1, 1899, and April 1, 1901, it had shipped about 40,000 tons of coal on which it had paid the full tariff rate, while other companies shipping freight to the same place at the same time had been allowed on their contract coal rebates of 5, 10, 15, 25, or 35 cents per ton.

The coal company claimed that as matter of law it was entitled to recover as damages the same rate per ton on all of its shipments as had been rebated to any other person on any of its tonnage shipped at the same time over the same road. The Supreme Court held that the measure of damages adopted by the trial court was erroneous; that to show the plaintiff paid the established legal rate and another shipper received a rebate showed no damage at all, and the cases bearing upon the question are reviewed as well as the act to regulate commerce. If the carrier in the case cited could not be held liable merely for the difference between the established rate and the amount of the rebate in a case of discrimination under section 2, it certainly can be argued with much more force that a shipper who has paid the legally established rate under section 1 may not recover the difference between that rate and the rate estabished by the commission for the future without proof that his actual damage did in fact amount to that sum. In the case of Meeker & Co., v. Lehigh Valley R. Co., supra, it appeared that so far as Meeker & Co. sought to recover damages by reason of paying an excessive and unreasonable rate from August 1, 1901, to July 17, 1907, the commission found that they were damaged to the extent of the difference between what they actually paid and what they would have paid had they been given the rate which the commission found would have been reasonable. The Supreme Court sustained this finding, and it was claimed by counsel that to so rule would be in conflict with Penna. R. Co. v. International Coal Mining Co., supra; but the Supreme Court explained that there was nothing in the Meeker & Co. Case in conflict with the former case. The court, in approving what was said in the International Coal Mining Company Case, said that in the Meeker Case the plain import of the findings of the commission were that the amounts awarded represented the claimant's actual pecuniary loss, and that in view of the recital that the findings were based upon the evidence adduced it must be presumed, there being no showing to the contrary, that they were justified by it; therefore the law as announced in the International Coal Mining Co. Case, received no modification, but on the contrary was approved in the Meeker Case. See, also, Penna. R. Co. v. Jacoby & Co., 242 U. S. 89, 37 Sup. Ct.

49, 61 L. Ed. 165; Clark Bros. Coal Mining Co. v. Penna. Ry. Co. (D. C.) 238 Fed. 642.

[16] In this case we are not dealing with the findings of the commission, but with the evidence which it is alleged did not support such findings. We therefore think that we must hold that the difference in the rate condemned and the rate established without other proof showing injury to the actual owner makes no case for damages against the carrier. So far as the record shows, the owners of the cattle might have sold them on the ranges, might have sold them f. o. b. points of origin, or might have sold them at delivered prices to which the freight charge was added. But we need not stop here. Why is the difference in the rate condemned and the rate established for the future the measure of the injury which the cattle owner received? The commission says because the owner received as much less for his cattle as the rate was unlawfully high, and therefore he was damaged in a sum equal to the difference in rates. Is this so? Have freight rates no influence upon the market price of cattle?

When we enter the domain of facts which everybody knows, to which counsel for plaintiff refers us, may we not know that freight rates may destroy commerce, may stop the shipment of cattle, that low freight rates increase the volume of transportation, and that freight rates must be such as will allow traffic to move, otherwise the carrier becomes bankrupt as well as the shipper? Can it be said that an owner of cattle who sells them upon the market is necessarily and without proof injured in the amount of the difference in the rate between a high and a low rate, assuming that the freight rate is deducted in each case from the amount for which the cattle sold? If the freight is high, is not the price of cattle affected accordingly; if so, how can we say the difference between the high and the low rate is the measure of damages? Upon reason and authority we are of the opinion that we cannot so say.

We are cited by counsel for plaintiff to the case of L. & N. Ry. Co. v. Finn, 235 U. S. 606, 35 Sup. Ct. 146, 59 L. Ed. 379, as sustaining the proposition that the commission had sufficient evidence before it to sustain its order. The case cited was a proceeding to recover upon a reparation order made by the Railroad Commission of Kentucky. The contention was made that the order was not supported by substantial evidence. The Supreme Court, in considering this contention, decided that the railroad company admitted by its answer that the rates mentioned had been charged, collected, and received by it, but denied that they were extortionate, unjust or unreasonable, and upon this ground and no other denied liability to make reparation. In its opinion the court said:

"In short, the record shows that the only question made respecting the reparation claims was the general contention that the rates charged by the company were in fact not unreasonable or extortionate; and that it was in effect conceded that the particular amounts claimed were proper to be awarded as reparation, if the rates charged were determined to be unreasonable and extortionate."

The findings and the order of the Kentucky Commission were therefore sustained, but that is not the kind of a case with which we are

now dealing. Counsel for the carriers persistently during the reparation hearings contended that there was no evidence that any owner of cattle had been damaged or that the persons named in the tabulated statement were the owners, or, if so, that they had paid the unlawful rate. Upon the contested propositions they conceded nothing. In view of what we have said, we are of the opinion that the findings and order of the commission were not sustained by the evidence. This being so, the prima facie case made by their introduction at the trial below was destroyed when the evidence upon which the findings and order were based appeared. The trial court therefore erred in refusing to declare the law to be that upon all the evidence plaintiff was not entitled to recover against any or all of the defendants.

We have not found it necessary to discuss or decide the other questions raised by counsel for defendants.

The judgment below is reversed, and a new trial ordered.