## GLENS FALLS PORTLAND CEMENT CO. v. DELAWARE & HUDSON CO. et al.

District Court, S. D. New York.

Feb. 8, 1932.

972

Cohen, Gutman & Richter, of New York City (Kenneth Dayton, of New York City, Frederick J. Brown, of Washington, D. C., and Burton A. Zorn and George H. Kenny, both of New York City, of counsel), for the motions.

Nathan Probst, Jr., of New York City, for defendant Delaware & Hudson Co.

H. T. Newcomb, of New York City, for other defendants.

WOOLSEY, District Judge.

I deny the plaintiff's motions in so far as they ask for judgment against the New York, New Haven & Hartford Railroad Company on the pleadings; in all other respects the motions are granted.

I. This action was brought to enforce a reparation order, dated August 14, 1930, of the Interstate Commerce Commission, hereinafter called the Commission, allowing a recovery to the petitioner in the sum of $12,588.63, with interest, against the Delaware & Hudson Company, hereinafter called the D. & H., the New York, New Haven & Hartford Railroad Company, hereinafter called the New Haven, and the New York, Ontario & Western Railway Company, hereinafter called the Ontario & Western.

The basis of the reparation order, as found by the Commission, is that within the period of two years antecedent to the plaintiff's application to it for relief the three defendant railroads against which the order was aimed charged the plaintiff unjust, unreasonable, and unlawful rates on shipments of cement moving over their lines from Glens Falls, N. Y., to New England destinations on the New Haven.

II. The box heading of the papers in this cause is unnecessarily cluttered with the names of defendants no longer involved, and the party situation should be cleared up before we take up the very interesting questions on which my decision herein turns.

The complaint in the proceeding brought by the plaintiff-petitioner before the Commission was filed on August 27, 1926.

At that time the Central New England Railway Company was an independent corporation and was a necessary and proper party to a proceeding before the Commission for the relief here involved. Since then, however, it has been merged with the New Haven, and thus is not now a separate entity, and therefore disappears automatically as a defendant herein, leaving the New Haven as its successor.

The Delaware & Hudson Railroad Corporation which took over all the railroad properties of the D. & H. on April 1, 1930, was not a party to the proceeding before the commission, for it was not then in existence. It was made a party to and served in the present action apparently on the theory that as successor carrier to the D. & H. it must have assumed the latter's liabilities. After this action was started, however, the attorneys for the petitioner became satisfied by the representations of the attorneys of the Delaware & Hudson Railroad Corporation that it had not assumed the said liabilities, and thereupon the action was voluntarily discontinued as against it.

The parties defendant to the instant case,

therefore, are the D. & H., the Ontario & Western, and the New Haven, and in that order their lines made up the only through route available to the petitioner for shipment of carload lots of cement from Glens Falls to destinations on the New Haven in Massachusetts, Connecticut, and Rhode Island, during the period for which reparation for rates charged was sought before and granted by the Commission and is now claimed in this action.

III. It appears from the report of the Commission here involved, New England Cement Rates, 155 I. C. C. 601 (Docket No. 18,112, decided June 3, 1929), and from some of its earlier published reports referred to therein that, leaving out importations from foreign countries, New England's cement requirements are almost entirely met by shipments from two, so-called, cement districts, the Lehigh district and the Hudson district.

In the report of the Interstate Commerce Commission in Allentown Portland Cement Co. et al. v. Baltimore & Ohio Railroad Co. et al., 49 I. C. C. 502 (No. 9544, decided April 11, 1918), which is referred to in the report of the Commission involved in the instant case, at page 607 of 155 I. C. C. there is a map inserted at page 505 of 49 I. C. C. in which the so-called Hudson district is outlined in what is substantially the form of a triangle, with its base running north and south between Hudson and Glens Falls, a distance of about 74 miles, and with Troy near the base line at a point slightly nearer Hudson than Glens Falls. The other two sides of the triangle come together substantially at Howes Cave, which thus constitutes the westerly apex of the so-called Hudson district, and which is about thirty-three miles to the north-westward of Hudson and about twenty-seven miles almost westward from Troy. It is shown from this map that Glens Falls has apparently always been dealt with as being in the Hudson district.

In the report of the Interstate Commerce Commission in Atlas Portland Cement Co. v. Central Vermont Railway Co., Director General et al., 63 I. C. C. 420 (No. 11,110, decided August 29, 1921), mentioned also at page 607 (of 155 I. C. C.) of the report of the instant case, the fact that Glens Falls was considered to be in the Hudson district is also shown, and the two districts are described. It was decided then that carload rates on cement from Hudson, N. Y., to points in New England then obtaining were not shown to be unreasonable or to subject Hudson to undue prejudice and disadvantage, or to give to the Lehigh district of Pennsylvania an undue preference and advantage. Accordingly, the complaint there made before the Commission was dismissed.

In that report, at page 420 of 63 I. C. C., the Hudson district and the Lehigh district are thus described:

"Hudson is situated on the east bank of the Hudson River, about 30 miles south of Albany, N. Y. It is served by the Boston & Albany and the New York Central railroads. It is in the same locality as Alsen, Howes Cave, and Glens Falls, N. Y., which also produce cement. There is another cement plant at Hudson Upper, which is for all practical purposes a part of Hudson. Alsen is on the west bank of the Hudson River, about 10 miles south of Hudson. Howes Cave is on the Delaware & Hudson, about 33 miles northwest of Hudson. Glens Falls is on the Delaware & Hudson, about 74 miles north of Hudson. The Knickerbocker Portland Cement Company, of Hudson Upper, intervened but presented no evidence. The Alpha Portland Cement Company, of Alsen, intervened and presented evidence. It asks for the continuation of rates on the Hudson basis, where now existing, and for the correction of certain alleged preferences of Hudson.

"The Lehigh district is situated mainly in eastern Pennsylvania but includes a mill or two in western New Jersey. The entire district extends about 70 miles from east to west and about 30 miles from north to south. Most of the 22 mills which comprise the district are situated within 20 miles of Allentown, Pa. Northampton, Pa., is in about the center of the group and by consent of all parties all distances are computed from Northampton. The mills in this district, which take group rates to New England, have intervened in opposition to the complaint. They and the carriers will be referred to collectively as the defendants. The Lehigh district, as represented by Northampton for mileage purposes, will be referred to merely as Lehigh. The term differential will be understood to mean difference in rate. Except where otherwise stated all rates and differentials are those in effect prior to the general increases authorized by us on July 29, 1920.

"By reason of the location of cement mills at Universal and New Castle, Pa., on the west and at Hagerstown and Baltimore, Md., and Fordwick, Va., on the south, which

serve the territories west and south of them,[2] the market for the cement of the Lehigh district is largely in New England and the middle Atlantic states, and this case unfolds to a major extent as a contest between the Hudson and the Lehigh districts for the cement trade of New England."

At page 423 of 63 I. C. C., the Commission says: "The record shows the grouping situation to be as follows: The rates are the same from all points in the Hudson district to points on the Boston & Maine. The rates are the same from Hudson and Alsen, but higher from Howes Cave and Glens Falls to New Haven points, but the Delaware & Hudson proposes to equalize these rates from Howes Cave and Glens Falls with those from Hudson and Alsen. Rates from Alsen higher than from Hudson to certain points on the Rutland are also to be made the same. Rates from Hudson to points on the Boston & Albany, which serves Hudson, are lower than from other mills in the Hudson district on other lines. The rates from each of the other mills for one-line hauls are also lower in many instances than from mills on other lines. It will therefore be seen that the rates from the Hudson district points are to some extent grouped. The rates from Hudson can not be considered wholly without reference to the rates from the other mills in the Hudson district."

Then on page 430 of 63 I. C. C., at the end of the report, in referring to the readjustment necessary in regard to the Glens Falls and Howes Cave rates, the Commission said:

"Some of the proposed readjustments have been effected since the hearing; those which remain should be promptly made effective.

"We find that the rates assailed as a whole are not unreasonable and do not subject Hudson to undue prejudice and disadvantage or give to the Lehigh district an undue preference and advantage. An order dismissing the complaints will be entered."

Prior to the proceeding before the Commission here involved, the freight rate structure for cement shipped from both the Lehigh District and the Hudson district was therefore on a group origin and group destination basis instead of a distance rate basis

which, when the petitioner's complaint was filed with the Commission, was the almost universal freight structure for cement throughout the United States.

Attacks previously made before the Commission on cement rates in New England had failed for reasons not necessary here further to develop, cf. Allentown Cement Co. et al. v. Baltimore & Ohio Railroad Co. et al., 49 I. C. C. 502 (Docket No. 9544, decided April 11, 1918), and Atlas Portland Cement Co. v. Central Vermont Railway Co., Director General et al., 63 I. C. C. 420 (Docket No. 11,110, decided August 29, 1921) from which I have quoted, and the rates had been held not unreasonable. Therefore they had remained unchanged for many years until this proceeding before the Commission, of which the reparation order at the base of this action was an incidental fruit. But the pressure from cement shippers for a new freight deal was increasing.

The report in which we are here interested is entitled, for convenience, New England Cement Rates, 155 I. C. C. 601, and was a consolidated report dealing with five separate complaints, No. 18,112, Atlas Portland Cement Co. v. Central R. R. of New Jersey et al.; No. 15,516, Atlas Portland Cement Co. v. Bangor & Aroostook R. R. Co. et al.; No. 18,744, Glens Falls Portland Cement Co. v. Boston & Albany R. R. Co. et al.; No. 20,279, Hercules Cement Corp. et al. v. Lehigh Valley R. R. Co. et al., and a reargument of Investigation and Suspension Docket No. 2013, Cement from Eastern Trunk Line Points to New England.

It will be seen from this summary of the proceedings involved here that there were a great many complaints and a great many defendants, some of which were not included in the complaint by the Glens Falls Portland Cement Company, the petitioner here; and that the reason why these proceedings were all combined was that the rate structures which were involved in these several applications and of which modification was sought were so interrelated that it was necessary for the Commission to take a general view of the question of the rates for shipment of cement from the Lehigh district as well as from the Hudson district to New England destinations.

The application, No. 18,744, of the petitioner in this case is to be differentiated from the applications of the other complainants because it alone asked, in addition to a readjustment of rates, for a reparation order, on the ground that the rates charged to it

---

[2] "There is an equality of rates from Hudson and Lehigh to the southeast, and to central freight association territory, but the complainant asserts that there is no appreciable movement of cement from either district to these territories except under abnormal conditions in the cement trade."

by the defendants here for shipments to points on the New Haven had been unreasonable on the old group basis.

As a result of these hearings, the Commission changed the whole rationale of the freight structure for cement to New England, both from the Lehigh and the Hudson districts, from a basis of group origin to group destination, to a distance scale basis, ordered a rerouting of cement from Glens Falls to destinations on the New Haven, and gave the petitioner the reparation order herein involved.

IV. It is necessary to the proper understanding of the situation involved herein to deal, first, with what might be called the railroad geography of the situation.

Glens Falls, N. Y., where the plaintiff's plant is situated, is, as above stated, about 74 miles almost due north of Hudson, N. Y., and not far from the boundary line between New York and Vermont.

From Glens Falls there were two physically available rail routes to destinations on the New Haven, of which Hartford will be taken, for convenience, as typical.

The longer route, 407 miles in distance, hereinafter referred to as the Sidney route, was by the D. & H. which was the receiving railroad for all shipments at Glens Falls, in a general southwesterly direction from Glens Falls through a place called Howes Cave to Sidney, which is a junction point with the Ontario & Western; thence by the Ontario & Western in a southeasterly direction to a place called Campbell Hall, where it forms a junction with what was formerly the Central New England Railway Company, and is now the New Haven; thence northeasterly through Poughkeepsie, thence southeasterly through Brewster to Danbury, thence easterly to Waterbury, thence northeasterly again to Hartford.

The other route physically available from Glens Falls to Hartford is only 179 miles long and will be referred to hereinafter as the Mechanicville route. It runs as follows: By the D. & H. from Glens Falls to a point slightly northwest of Mechanicville, where it branches off to Mechanicville, which is a junction point with the Boston & Maine, thence to Troy, and thence by the New Haven again from Troy southeasterly to Chatham, thence to Boston Corners, and thence by the former Central New England Railroad, now the New Haven, easterly through State Line, Canaan, and Winsted, to Hartford.

Owing to the fact that when the petitioner's application was filed with the Commission the railroads had not opened up the Mechanicville route on a through rate basis there was, in effect, only one railroad route, the Sidney route, available to a cement shipper from Glens Falls to points on the New Haven, and on that one railroad route, owing to the fact that the New Haven received a higher per cent. and a higher rate when cement traffic originated in the Lehigh District, cf. New England Cement Rates, 165 I. C. C. 601, at page 633, the D. & H. failed to establish the same rate for shipments of cement from Glens Falls to New Haven points of destination as it had established for other Hudson District points of shipment. With a group origin to group destination freight structure and a reasonable rate fixed on such basis, to charge shipments from one point in the group more than from the other points was obviously to charge an unreasonable rate.

That is what was done to the petitioner. It based its prayer for reparation on that fact. The Commission agreed the charge was unreasonable and granted the reparation prayed for. Herein lies the essence of this case.

On the date when the petitioner's application was filed, the New England cement rates had for a long time been governed by the decisions in the Allentown Case, and the Atlas Portland Cement Case, just cited. With regard to those cases, the Commission said in the report now before me, at page 625 of 155 I. C. C. (italics mine): "Defendants, respondents, intervening carriers, and many intervening cement producers take the position that in view of the findings in Atlas Portland Cement Co. v. C. V. Ry. Co., supra, the rates assailed, and particularly from Hudson, should not be found unreasonable, and urge that the present relationship between the rates from the Hudson district and from the Lehigh district should be maintained. In the case just cited, we found the rates from the Lehigh district to New England not unreasonably low. In the Allentown Case, the rates from the Lehigh district to points on the Boston & Maine, Maine Central, St. Johnsbury & Lake Champlain, and Montpelier & Wells River were found not to be unreasonable as maxima. *Except as changed by the general increases and reduction, the rates are practically the same today, except from Glens Falls to New Haven points, as at the time those cases were decided.*"

The rate fixed from points of shipment in the Hudson district, other than Glens Falls, to Hartford, was 17 cents per hundred pounds, the rate obtaining when the railroads won the Atlas Portland Cement Co. Case before the Commission in 1921. The rate charged to the petitioner from Glens Falls within the two years before it filed its complaint with the Commission was 20.5 cents per hundred pounds.

As the cement business is highly competitive business, this difference in freight rate was a question of serious concern to the plaintiff, and is claimed to have interfered with its sales, because it meant a difference in price at destination of about 13 cents per barrel of cement.

V. Thus, on August 27, 1926, when the complaint by the petitioner was filed with the Interstate Commerce Commission, the whole Hudson district had been suffering from a wrong routing for shipments to Hartford; but, in addition, the petitioner had been suffering from having a higher freight rate charged on shipments from Glens Falls than other shippers had been charged for shipments from other places in the Hudson district.

The situation, therefore, was somewhat peculiar for the railroads were guilty, as the Commission found, of the following wrongs: (1) A refusal to open on a through rate basis the short and wholly feasible route via Mechanicville; (2) discrimination between Glens Falls and other Hudson district shipping points; (3) charging unreasonable rates on shipments from Glens Falls to New Haven points.

The petitioner, therefore, was in the situation of a party with a choice of causes of action for damages, and it elected to seek reparation for the unreasonable freight rates charged to it by the Sidney route, which was the only route to New Haven destinations available to it.

Possibly the petitioner made this election because the measure of damages was simple on such a basis, but, however that may be, the Commission sustained the petitioner in the cause of action which it elected to maintain and gave it reparation damages on that basis. If there was evidence before the Commission in this case, or if, as I understand it, the Commission had already decided on proper evidence adduced in the Atlas Portland Cement Co. Case that a 17-cent rate was a reasonable rate on a group basis from the Hudson district to Hartford, the finding of the Commission cannot

properly be challenged. Whether there was such evidence, of course, is a matter which must be left to be determined at the trial on the issues raised by the denials in the answers.

VI. Accordingly, the railroads had been operating on a group origin to group destination basis of freight rates, and had been charging the same rates since 1918, except on shipments from Glens Falls to New Haven points, which have been at a higher rate than on shipments from other points in the Hudson District.

In New England Cement Rates, 155 I. C. C. 601, commencing at page 631, the Commission said (italics mine):

"With the exception of the rates under review in I. & S. 2013, decided April 14, 1924, we have not considered the rates here in issue since Atlas Portland Cement Co. v. C. V. Ry. Co., supra, decided August 29, 1921. *At that time the rates on cement throughout a substantial portion of the United States were on a group basis, similar to the rates here under consideration, little regard being given to distance.* Since that date we have prescribed distance rates on cement in Indiana and from interstate shipping points to points in that State, in Oklahoma, Texas, Arkansas, and Louisiana west of the Mississippi River, from Montana producing points to destinations in North Dakota and South Dakota, and throughout the southeastern territory. Rates on a distance basis have been voluntarily established throughout the remaining portion of central territory and in the trunk-line territories. *In other words, distance rates now apply* throughout all the country from New England and the Atlantic Ocean on the east to the Rocky Mountains on the west, except a relatively small portion of Missouri. *These distance rates have been established as a result of the continuous insistence of the cement industry, as a whole, for transportation charges that will reflect the relative length of hauls employed.* The position of the complainants in the Hudson district in this case is exactly the same as the positions maintained by all cement industries and by many of the carriers in other cases to which reference is made herein. *It is believed, therefore, that the only way that the rate adjustment on cement into New England from the Hudson and Lehigh districts can be placed on a permanent and justifiable basis is by prescribing rates on a distance basis that will give proper consideration to the geographical locations of* the two districts. As said in the Allentown Case, the

present rate structure on cement into New England has resulted in large part from the subordination of transportation conditions to commercial considerations, and no permanent solution of the problems presented could be attained for the future without reversing the process. The scale herein prescribed as reasonable will result in increased rates to some points, particularly from Hudson and Hudson Upper to Boston, but it will result generally in a lower basis than now applies from both the Hudson district and the Lehigh district. The financial condition of the New England lines is the primary consideration that persuades us to prescribe a basis of rates as high as such scale will produce. The rates herein prescribed as reasonable will remove any undue prejudice that may exist between the producing districts.

"It is apparent that any scale which would be reasonable for application to points on the Boston & Maine, Boston & Albany, and New Haven would be too low for application to points on the Bangor & Aroostook and probably contiguous points on the Maine Central. New England could be divided the same as for the class rates, but in other territories where we have prescribed rates on cement, notably in western trunk-line, southwestern, central, and southern territories, the different cement-scale territorial boundaries do not follow the territorial boundaries ordinarily used under the class-rate adjustments. As previously stated, certain interests suggest that the dividing line for different rate territories in New England should be through Portland, Me., but it is believed that the more appropriate division should be as suggested by the Maine Central, that is, all the territory north and east of Rockland Me. On traffic moving in the territory beyond such line there should be added to the scale herein prescribed, for the other portions of the destination territory, reasonable differentials to accrue entirely to the carriers operating north and east of such line, in addition to their regular divisions of the through rates under the scale herein prescribed as reasonable.

"In Atlas Portland Cement Co. v. C. V. Ry. Co., supra, at page 423 [of 63 I. C. C.], in commenting upon the fact that rates from Glens Falls and Howe's Cave to New Haven points were higher than from other producing points in the Hudson district, we observed that *'the Delaware & Hudson proposes to equalize these rates from Howe's Cave and Glens Falls with those from Hudson and Alsen.'* In the same case, at page 430 [of 63 I. C. C.], in referring to the revisions proposed by the carriers in that case, we said that such revisions should be promptly made. Such equalization, however, was not effected until April 12, 1927, when they were reduced to the Alsen basis over the route through Sidney, and on May 18, 1927, over the new route via Mechanicville. Such action was delayed notwithstanding complainant in No. 18744 had repeatedly requested an equalized basis from Glens Falls to New Haven points. The Delaware & Hudson, upon the rails of which the Glens Falls mill is located, argues that the rates from Glens Falls to destinations on the New Haven were not unreasonable prior to the reduction as compared with the rates from other producing points in both the Hudson and Lehigh districts. Such contention is predicated on the ground that the open tariff route from Glens Falls (via Sidney) was considerably longer than any of the routes from producing points in either the Hudson or the Lehigh district, and the earnings under such higher rate and longer route did not compare unfavorably with the earnings from the other producing points. Complainant in No. 18744, however, not only attacks the *measure of the rates* from Glens Falls but also attacks the practice of the Delaware & Hudson and the New Haven *in refusing and neglecting to establish a through route by way of Mechanicville* in connection with the Boston & Maine, which it contends was an entirely practical one. *Prior to the establishment of the joint rates via the Mechanicville route, prohibitive combination rates applied.* Neither the Delaware & Hudson nor the New Haven introduced any evidence to show that the Mechanicville route was impractical or illogical prior to the time it was opened. As previously stated, the prevailing rate from Glens Falls to New Haven points was 20.5 cents. The average distance from Glens Falls to the common, junction, and terminal points, previously referred to, in Connecticut, was 183 miles, in Rhode Island, 242 miles, and in Massachusetts, 207 miles. The 20.5 cent rate for such distances produced average earnings to the Connecticut points of 22.4 mills per ton-mile and, based on 38 tons per car, 85 cents per car-mile. The earnings to the Massachusetts and Rhode Island points for the greater distances were lower. The earnings under the 17-cent rate subsequently established to New Haven points are approximately 83 per cent. of the earnings above mentioned. The 3.5 cent differential, Glens

Falls over Hudson and Alsen to New Haven destinations, was equivalent to about 13 cents per barrel on cement, and it is somewhat difficult to understand how the Glens Falls shipper could overcome such a differential. The failure of the Delaware & Hudson to establish rates from Glens Falls to New Haven points on the same basis as applied from other producing points in the Hudson district appears to have been due to the fact that the New Haven received a higher per cent. and higher rate when the traffic originated in the Lehigh group.

"That complainant in No. 18744 was at a substantial disadvantage in the marketing of its product at New Haven destinations is not questioned, and the failure of the Delaware & Hudson and the New Haven to open up the route by way of Mechanicville in connection with the Boston & Maine compelled said complainant to use routes unreasonably long and was, during the two years prior to the filing of the complaint in No. 18744, unreasonable and in violation of the interstate commerce act. It is not believed that reparation should be awarded to this complainant on shipments to points on lines other than the New Haven, nor to a basis lower than the 17-cent rate subsequently established.

"We find that the rates assailed in No. 18744 for transportation from Glens Falls to points on the New Haven, during two years prior to August 27, 1926, were unreasonable to the extent that they exceeded the rates established on April 12, 1927; that the complainant in that case made shipments during said period to which said rates were applied, and paid and bore the charges thereon; that it has been damaged thereby and is entitled to reparation to the basis of rates established effective on said April 12."

The Commission then prescribed a distance scale of rates in cents per 100 pounds both for shipments from Glens Falls and the other points in the Hudson district, and found that any rates charged in future in excess of those prescribed would be too high. Then, on page 635 of 155 I. C. C., the method by which the distance rate should be applied was prescribed as follows:

"In computing distances under the scale of rates and differentials proposed the shortest routes via existing connections for the interchange of carload traffic should be used.

"The rates from the Hudson district should be computed on the actual distances from each shipping point for hauls of 60 miles and less, and for hauls of greater length

the rates should be computed on basis of the average distance from Hudson, Hudson Upper, Alsen, Glens Falls, and Howe's Cave, and from the Lehigh district the rates should be computed on the distances from Northampton, Pa."

This quotation, with what has been said before it, completes, so far as we need it, in convenient form, the history of cement rates to New England.

VII. The inspiration for the attack in the Commission's report by the defendants here on the ground that it does not involve, properly speaking, a reparation order is apparently to be found in the dissent from the Commission's report in regard to the reparation order filed by Commissioner Woodlock and concurred in by Commissioner Eastman. Commissioner Woodlock said at page 636 of 155 I. C. C.: "I concur in the instant report with exception of the finding as to the Glens Falls rates prior to April 12, 1927. Taking Hartford as typical of Connecticut points, shipments from Glens Falls moved prior to that date over a very circuitous route via Sidney, Campbell Hall, Danbury, and Waterbury, a total of 409 miles. The direct route, Mechanicville, Albany, State Line, Canaan, 179 miles, was open only on combination rates higher than the rate applicable over the longer route which was 20.5 cents. This rate was voluntarily reduced April 12, 1927, to 17 cents (after filing of this complaint) and on May 18, 1927, was made applicable over the shorter route. The rate prescribed herein for 409 miles is 21 cents; there was therefore no unreasonableness in a rate of 20.5 cents for that distance. The violation of section 1 of the act was in the failure of the carriers concerned, viz, Delaware & Hudson, Boston & Albany, and New Haven, to open the Mechanicville, State Line, Canaan route prior to May 18, 1927. The record shows that this failure was due to the refusal of New Haven, notwithstanding the willingness of the other two carriers concerned, to make that route available. In the circumstances, the violation is New Haven's and New Haven should make the reparation. The case is analogous in principle to a misrouting case rather than to one involving merely level of rates."

Both Commissioner Woodlock and Commissioner Eastman concurred in the finding regarding the distance scale for future rates which was fixed by the Commission, and in their dissent on the reparation order granted to the petitioner seem to have failed to note the important proviso attached in the ma-

jority report to the distance scale of rates, namely, that the distance scale rate was to be computed on the shortest routes existing for interchange of carload traffic.

Owing to this proviso, the railroad would not be free, as Commissioner Woodlock implies, to route Glens Falls cement traffic for Hartford by the long route via Sidney and charge freight for the distance thus hauled, 407 miles; but if it did route the cement via Sidney it would have to charge for it on the basis of the short route through Mechanicville, 177 miles, so that instead of being able to charge under the new rate structure, as Commissioner Woodlock suggests, 21 cents per 100 pounds from Glens Falls to Hartford, the carrier would be able to charge only 14.5 cents.

If the Commission in its reparation order had allowed the petitioner the difference between 20.5 cents and 14.5 cents per 100 pounds, it would have been dealing with the wrongful failure to open the Mechanicville route, and the fact that Glens Falls was charged at a higher rate than any other point of origin in the Hudson district would thus have made the routing question a basis of liability for damages.

It did not do this, however, but assumed for the purpose of its decision that as all the cement originating in the Hudson district and destined to New Haven points had been routed via Sidney, and as 17 cents had been regarded as the reasonable rate since its decision in 1921, it must, in order to be fair to the defendants, give damages only for the difference between the 20.5-cent rate actually charged from Glens Falls and the rate of 17 cents, which had been previously found reasonable. Thus, the report in this respect disregarded entirely the question of the New Haven's refusal to route the carloads of cement from Glens Falls via Mechanicville.

In fact, I think the very point to which Commissioner Woodlock calls attention is the point which shows that the Commission was entering a pure rate reparation order and giving relief on the basis of level of rates and not on the basis of misrouting. This is clearly shown, moreover, by the fact that the reparation order is aimed at the Ontario & Western, which could not possibly have been involved in any way in any fault with regard to failure to route carloads of cement from Glens Falls via Mechanicville to Hartford or other New Haven points.

The sum and substance of the whole matter is therefore that the petitioner, having two or three grounds of complaint, chose to press for a rate reparation order, which it has successfully obtained.

VIII. In the papers before me I have: (1) The complaint filed before the Commission by the petitioner which is annexed to the petition as a schedule thereof; (2) the reparation order to enforce which the petition is brought and which is set forth in full in the petition and which incorporates by reference the Commission's report on which it is based; (3) the report of the Commission which is annexed to the answer of each of the three defendants, apparently to illustrate that the reparation order on which the petitioner relies is not based on adequate findings by the Commission.

As above shown, the petitioner's cement had all been shipped by the Sidney route, and the charges for freight incurred had been paid to the New Haven for the benefit of itself and the other two defendants here.

The petitioner's complaint before the Commission made defendants, in addition to the defendants here sued, all the railroads carrying cement or so located that they could be availed of for that purpose, from the Hudson district and from the Lehigh district, and had three gravamens and ended with a triple prayer based respectively on the gravamens.

The relief sought was: (1) Reasonable future rates from Glens Falls to destinations on the New Haven; (2) reparation for unreasonable rates which had been charged; and (3) for a rerouting, i. e., that defendants "according as they participate in the transportation" shall be required to establish through routes and reasonable joint rates from Glens Falls to New Haven destinations via Mechanicville on lines of D. & H., Boston & Maine and New Haven.

The only order entered on the opinion of the Commission which is of materiality or interest in this case is the order of August 14, 1930, as amended, fixing the damages to which the plaintiff was entitled in pursuance of the decision there made that it was entitled to reparations. By this order it was provided that the D. & H., the Ontario & Western, and the New Haven, the three railroads which together had constituted the Sidney route, should be authorized and directed to pay to the Glens Falls Portland Cement Company on or before September 27, 1930, the sum of $12,558.63, with interest at the rate of 6 per cent. from the respective dates of payment of the charges assailed, shown in statements agreed to between the cement company and the New Haven, as rep-

aration on account of unreasonable rates charged for the transportation of numerous carloads of cement from Glens Falls to destination on the New Haven.

This order of the Commission was not honored by the defendant railroad companies, and the plaintiff has brought suit to recover the sum named therein, together with a reasonable attorney's fee, which it is suggested in the complaint should be fixed at the sum of $3,000.

IX. On August 27, 1926, the complaint of the plaintiff, docketed by the Commission as No. 18744, was filed. The defendants herein named were all duly served therewith.

On November 14, 1929, the D. & H. filed with the Commission an application, which was docketed by the Commission as finance docket No. 7359, in which leave was sought by the D. & H. to transfer all its railroad properties to the Delaware & Hudson Railroad Corporation, a new corporation formed for the purpose of taking over these properties.

On January 16, 1930, this application was granted, and a certificate of convenience was issued on that date by the Commission, whereby it was certified that the D. & H. should be permitted to abandon the operation of the lines of railroad then operated by it in New York, Pennsylvania, and Vermont, provided the operation of the lines was immediately assumed and continued by the new company above mentioned.

The order of the Commission entered on this certificate of convenience provided that the D. & H. was authorized to buy the capital stock and to transfer its railroad properties to the Delaware & Hudson Railroad Corporation; for the cancellation of the schedules of tariff filed by the D. & H.; and for the assumption of liability by the new company of the bonds of the D. & H.

The transfer thus allowed occurred at 12:01 a. m. on April 1, 1930, and from that hour and date the D. & H. ceased to be a carrier and became a private holding company.

X. The answer of the D. & H. sets up as its first separate defense that by reason of the order entered on the certificate of convenience by the Commission, which as just noted became effective April 1, 1930, allowing it to transfer all its property and operations to the Delaware & Hudson Railroad Corporation, it ceased on that date to be engaged in interstate commerce as a carrier, became a private company, and was no longer subject to any power over carriers conferred by Congress on the Commission, and that therefore the reparation order here, which was entered subsequent to this change of status, was wholly ineffectual and void as against it.

I am told that this raises an entirely novel point, and it may well be so, for I fancy that instances are rare where a corporation, which is a solvent going concern under the jurisdiction of the Commission, is allowed to transfer its carrier properties to another corporation, and thus put itself outside of the ambit of the Commission's administrative powers.

It is common ground between the parties, of course, that after this change of status on April 1, 1930, the Commission would have been powerless to have issued any regulatory orders against the D. & H., and, of course, thereafter there could not have arisen any basis for any reparation orders against it because it was no longer a carrier, and the question of reasonable rates would be entirely foreign to it.

But here we have a case where a proceeding was pending against the D. & H. at the time when its status was changed. It had been represented on this hearing by counsel, of whom one represents it here, and therefore it had knowledge of the hearing and of the report of the Commission which was rendered thereon almost a year before the certificate of convenience was allowed to it.

The situation of the D. & H. at the time when it thus changed its status was, it seems to me, juridically analogous to that of a defendant against whom an interlocutory decree had been rendered involving injunctive relief and incidental damages for past torts which remained to be proved.

Analogies are not far to seek. If a suit in equity had been brought in this court—say for unfair competition—in which the jurisdiction over the subject-matter was based on diversity of citizenship and the amount involved in the controversy, and in that suit an interlocutory decree had been granted to the plaintiff providing for an injunction and for an accounting, the jurisdiction of this court could not have been ousted by the defendants becoming citizens of the same state as the plaintiff after that decree, or by a voluntary reduction on the part of the plaintiff of the amount claimed, or by change of any other circumstance on which subject-matter jurisdiction once acquired was based. Kirby v. American Soda Fountain Co., 194

U. S. 141, 145, 146, 24 S. Ct. 619, 48 L. Ed. 911; Louisville, etc., Ry. Co. v. Louisville Trust Co., 174 U. S. 552, 566, 19 S. Ct. 817, 43 L. Ed. 1081; Koenigsberger v. Richmond Silver Mining Co., 158 U. S. 41, 49, 50, 15 S. Ct. 751, 39 L. Ed. 889; Clarke v. Mathewson, 12 Pet. 164, 9 L. Ed. 1041; Morgan's Heirs v. Morgan et al., 2 Wheat. 290, 297, 4 L. Ed. 242; Lebensberger v. Scofield, 139 F. 380, 384 (C. C. A. 6); Ex parte Kyle (D. C.) 67 F. 306, 309; Hatfield v. Bushnell, 1 Blatchf. 393, 11 Fed. Cas. 814, 815, No. 6211.

Similarly if, in a case where suit on a patent had been brought in this court, the patent on which the court's subject-matter jurisdiction was based should expire during the pendency of the suit, of course an injunction in such a case would not be granted; but the court would not lose jurisdiction and could continue the suit for the accounting incidental to past torts involved in trespasses by infringement. Beedle v. Bennet, 122 U. S. 71, 75, 7 S. Ct. 1090, 30 L. Ed. 1074.

The only difference between the situations outlined in these examples and the situation here is that here the Commission itself gave permission to the D. & H. by certificate of convenience to change its status into that of a private corporation by the transfer of its carrier properties, and the argument may be pressed that this case is differentiated from the suggested analogies because here the Commission, by its own act, dismissed the D. & H. from its jurisdiction, and hence, that thereafter nothing which the Commission may have done could possibly affect it in any way.

This argument would have very considerable force if it were not for the fact that the D. & H. had been held guilty by the Commission, in what is analogous to an interlocutory decree, of a series of torts, i. e., charging unreasonable freight rates to the petitioner, and that its liability therefor would continue unless expressly released in some fashion. These torts were private liabilities to the petitioner of which another could not purge the D. & H.

What happened was, in effect, that, through a misconstruction of its situation, the D. & H., knowing it was free from *future* control by the Commission, chose to default in respect of any participation in the proceedings maintained under rule V of the Rules of Practice of the Commission to fix the amount of the petitioner's damages.

I hold, therefore, that the reparation order must have the same juridical status against the D. & H. in this case as against the other two defendants who are still, as carriers, within the jurisdiction of the Commission. In other words, the D. & H. retired to private life cum onere of these past misdeeds.

Accordingly, the plaintiff's motion to strike out the first separate defense of the D. & H. must be granted.

So far as a similar defense is pleaded by the Ontario & Western, and by the New York, New Haven & Hartford, as their several first separate defenses, they should be stricken out for the reason that whether I am right or wrong in my view with regard to my method of dealing with what I may call the jurisdictional defense of the D. & H., inasmuch as the liability of the Ontario & Western and of the New Haven for rate torts is individual and separate, Lewis-Simas-Jones Co. v. Southern Pac. Co., 283 U. S. 654, 660, 51 S. Ct. 592, 75 L. Ed. 1333; Louisville & N. R. Co. v. Sloss-Sheffield Steel & Iron Co., 269 U. S. 217, 232, 233, 46 S. Ct. 73, 70 L. Ed. 242, and the jurisdictional situation of the D. & H., if any there be, has not any bearing whatever on the case of the other two railroads; thus, the first separate defense of each of them must be stricken out.

XI. As to the other separate defenses filed on behalf of all three defendants, it is to be observed that none of them pleads that there is not evidence sufficient to sustain the Commission's report. The matters pleaded, therefore, may all be met by the papers before me and disposed of thereon.

XII. The second separate defense of all three defendants is, in effect, that the proximate cause of the damage, although not so alleged, is the failure of the D. & H. to establish reasonable rates via Mechanicville to New England destinations, and that inasmuch as the route via Mechanicville consists in part of the line of the Boston & Maine, and in no part of the Ontario & Western, the Boston & Maine was a necessary and essential party in this action, and the Ontario & Western should not be a defendant. This must be stricken out, because, as I have held that the order here involved is a true reparation order for rate torts of which the three defendants here were guilty as they jointly participated in it, the defense pleaded cannot stand; and, furthermore, it is obvious that Boston & Maine, which did not participate in the torts because no part of the unreasonable freight was paid to it, could not properly be a party to this action.

■ XIII. The third separate defense takes the new schedule of distance rates fixed by the Commission for the future and says that the rate for the circuitous route via Sidney charged to the plaintiff was less than the distance rates fixed by the Commission for the future, and that therefore the through rate charged by the carriers was not unreasonable, and that no damage was suffered by the petitioner. This defense is an embodiment of the essence of Commissioner Woodlock's dissent and refers to the report of the Commission, which is made Schedule A of the answers.

This defense must be stricken out, for it is subject to the same infirmity as is inherent in Commissioner Woodlock's dissent. This I mentioned above.

■ XIV. The fourth separate defense is also stricken out, under the principles stated in the earlier part of this opinion in regard to the group origin and group destination freight structure obtaining before the distance rates were put in force by the Commission in the report under consideration. A rate of 17 cents per hundred pounds had been the rate obtaining as reasonable for years from other Hudson district points than Glens Falls to New Haven destinations. Certainly the fact that it was put in force by the carriers without a formal order of the Commission (though, be it noted, in pursuance of the warning, above quoted, given in the Atlas Portland Cement Co. Case) is not a reason which precludes the Commission from assuming 17 cents per hundred pounds as the reasonable rate from Glens Falls via Sidney to New Haven points. Leaving aside the general principle of volenti non fit injuria, the authorities seem to be with the Commission, for, after all, the carrier is, of course, the primary rate maker. Interstate Commerce Comm. v. Northern P. R. Co., 222 U. S. 541, 550, 32 S. Ct. 108, 56 L. Ed. 308; Interstate Commerce Comm. v. Chicago G. W. Ry. Co., 209 U. S. 108, 119, 28 S. Ct. 493, 52 L. Ed. 705.

■ XV. The fifth separate defense is stricken out because it cannot stand in the face of my rulings in the earlier part of the opinion. It is also subject to the criticism that it is purely argumentative, and as such, it might be added, notably unimpressive, because the doctrine of stare decisis does not apply to the Commission, and the courts are not interested with inconsistencies in its different reports. Virginian Ry. Co. v. U. S., 272 U. S. 658, 665, 666, 47 S. Ct. 222, 71 L. Ed. 463.

■ XVI. The sixth affirmative defense attacks the reparation order on the ground that it is not supported by findings of the Commission properly to be attributed to the petitioner's proceeding.

With this I entirely disagree, and find that this defense must be stricken out because in the part of the Commission's report quoted from above findings are made in respect of the petitioner's proceeding adequate entirely to support the reparation order. Meeker v. Lehigh Valley R. Co., 236 U. S. 412, 427, 428, 35 S. Ct. 328, 59 L. Ed. 644, Ann. Cas. 1916B, 691; and cf. Mills v. Lehigh Valley R. Co., 238 U. S. 473, 481, 35 S. Ct. 888, 59 L. Ed. 1414.

■ XVII. As to the motion for judgment on the pleadings it must be remembered first, that the reparation order and the report of the Commission are merely prima facie evidence of the facts therein stated. Meeker v. Lehigh Valley R. Co., 236 U. S. 412, 430, 35 S. Ct. 328, 59 L. Ed. 644, Ann. Cas. 1916B, 691, and have the same juridical status as the report of an auditor in an action at law. Cf. In re Peterson, 253 U. S. 300, 313, 314, 40 S. Ct. 543, 64 L. Ed. 919.

A reparation order and report of the Commission do not establish *prima facie liability* on the part of a defendant against whom a reparation order is granted, for they are challengeable on various grounds, which will be found conveniently summarized by Mr. Justice Brandeis in his dissenting opinion in St. Louis & O'Fallon R. Co. v. U. S., 279 U. S. 461, at pages 492, 493, 49 S. Ct. 384, 73 L. Ed. 198, and which are usually not open for consideration until the evidence taken before the Commission is introduced by one of the parties before a court on plenary hearing. Cf. Atchison, T. & S. F. Ry. Co. v. Spiller, 246 F. 1, 6–16 (C. C. A. 8).

■ As the New Haven has denied that the rates charged by it to the petitioner were unreasonable or improper, and also has denied that the action of the Commission was in accordance with law, meaning presumably that the findings of the Commission's report are not adequately supported by the evidence before it, it is entitled, despite the fact that its separate defenses have been stricken out, to its day in court on these residual issues, North German Lloyd v. Elting, 48 F.(2d) 547, 550 (C. C. A. 2); United States v. Diamond (D. C.) 50 F.(2d) 263, and also, of course, on the amount of the attorney's fee properly to be allowed herein if a recovery is had.

Settle order on two days' notice.