78 N.J. Super. 335 (1962)
188 A.2d 448
NEWARK STEEL WAREHOUSE, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
PEARL METAL PRODUCTS, INC., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided August 28, 1962.
*337 Mr. Myron S. Lehman, attorney for plaintiff and receiver.
Mr. David M. Satz, Jr., United States Attorney, attorney for United States Government (Mr. Robert D. Carroll, Assistant United States Attorney appearing).
Mr. Allan L. Tumarkin, attorney for Webster Factors, Inc.
PASHMAN, J.S.C.
This is the adjourned return date of an order to show cause why the validity and priority of claims embodied in the final account as submitted by the receiver of Pearl Metal Products, Inc., an insolvent corporation, should not be approved, and for allowances to the receiver, the attorney for the receiver, the attorney for plaintiff, and the countersigner for the performance of services attendant to the receivership proceedings.
The United States of America, Webster Factors, Inc. and the Township of North Bergen have individually and collectively raised several objections to the substance of the accounting and the amount of the allowances sought.
Because of the complexity of the issues presented by the objections, I think it best that the factual and legal contentions *338 contained in the affidavits and papers filed to date be set forth in some detail.
Pearl Metal Products, Inc., a corporation of New Jersey (hereafter Pearl Metal) was, on the complaint of Newark Steel Warehouse, Inc., a creditor of Pearl Metal, ordered and adjudged insolvent by this court on October 13, 1961, pursuant to N.J.S.A. 14:14-3. George R. Handler, Esq., was appointed statutory receiver.
Thereafter the receiver proceeded to perform the services required of him under R.S. 14:14-1 et seq., including, inter alia, the obtaining of orders appointing an appraiser, auctioneer and attorney. The receiver obtained an order to sell the assets, real and personal, at public sale, which sale was effectuated and subsequently approved. Following the consummation of these as well as many other duties, the receiver filed his final account in which he detailed the assets received by him, his disbursements, and the balance remaining in his hands, which all parties agree equals $13,832.69. (Intervening transactions, where relevant, will be discussed infra.)
Among the many papers filed with this court by the receiver was a "Report of Claims" in which the following classifications as to the "proper order of priority" of claims were listed:

 "Secured Claims
 Webster Factors (against sums realized on the sale of
 personal property only  claims subject to adjustment
 because of credit due on accounts receivable collected) $22,000.00
 Priority Claims
 Director of Internal Revenue ............................... 8,345.53
 State of New Jersey, Division of Employment Security 2,022.60
 Township of North Bergen ................................... 944.49
 Wage Claims
 * * *
 Unsecured Claims
 * * *"

Subsequent to the filing of this report, the petitions for allowances to the receiver, Mr. Handler, the attorney for the receiver, Myron S. Lehman, Esq., the attorney for the plaintiff, *339 also Mr. Lehman, and the countersigner were submitted. The receiver requested an allowance of $4,000 plus costs and expenses; the attorney for the receiver, who is also the attorney for the plaintiff, asked for $4,000 plus expenses for acting in the former capacity, and $350 plus expenses for acting in the latter capacity; the countersigner asked for $383.89, 1% of the total gross estate of Pearl Metal. It is these preceding reports which form the nub of the present controversy in this case.
The major conflict concerns the priority list submitted by the receiver wherein the claims of the United States and the Township of North Bergen are subordinated to the "secured claim" of Webster Factors. A secondary conflict involves the amount sought by the receiver and the attorneys which exceeds 60% of the balance of the net estate.
Returning to the receiver's classification of priorities, both the United States and Township of North Bergen contend they are prior to the claim of Webster Factors; the township bases its assertion upon a literal reading of N.J.S.A. 54:4-106, and the United States offers as its authority section 3466 of the Revised Statutes, 31 U.S.C.A., § 191, and federal decisions interpreting it.
Before embarking upon a discussion of the authorities noted by the contestants, it is imperative that certain details relating to the relationships between the insolvent, Pearl Metal, and the disputants, Webster Factors, United States of America and Township of North Bergen, be related more fully.
As appears from the memoranda, affidavits and exhibits submitted on behalf of Webster Factors, this claimant and Pearl Metal entered into the following transactions:
(a) On December 17, 1954, Pearl Metal and Webster Factors entered into a factoring agreement whereby Webster was to advance funds to Pearl Metal against such accounts receivable as may be acceptable to Webster Factors;
(b) On February 1, 1957 the parties executed a chattel mortgage on certain machinery and equipment detailed in *340 a schedule attached thereto. This chattel mortgage presumed to secure the obligation of Pearl Metal on the "factoring agreement dated December 17, 1954, or otherwise, and all sums advanced to this date and in the future, pursuant to the said factoring agreement, or otherwise." This mortgage was filed of record on February 1, 1957;
(c) On April 3, 1961 a subsequent chattel mortgage was entered into on certain equipment and machinery in addition to those covered by the chattel mortgage dated February 1, 1957, which was expressly stated to remain in effect as regards the chattels covered thereunder. This 1961 mortgage, as its predecessor, was intended to cover: "All sums heretofore and this day advanced and in the future to be advanced, * * * pursuant to factoring agreement dated December 17, 1954, as modified and renewed, or otherwise advanced." This mortgage was filed of record on April 7, 1961.
In addition, the following are relevant:
(1) Notice of factor's lien dated April 3, 1961 and filed April 7, 1961;
(2) Notice of factor's lien dated July 27, 1961 and filed August 2, 1961;
(3) Notice of factor's lien dated August 15, 1961 and filed August 18, 1961;
(4) Affidavit of Mr. Milberg, president and treasurer of Webster Factors, dated June 19, 1962, attesting to the fact that as of May 31, 1962 the balance due Webster Factors from Pearl Metal was $22,273.54. By a supplemental letter of August 8, 1962 a further statement was submitted that the balance due as of that date was $21,273.54.
Putting aside for the moment the monetary amount available to Webster Factors, the foregoing transactions of December 17, 1954, February 1, 1957 and April 3, 1961 are said to amount to a lien superior to the tax lien of the United States by virtue of 26 U.S.C.A. § 6323, which provides:
"(a) Invalidity of lien without notice.  Except as otherwise provided in subsection (c), the lien imposed by section 6321 shall not be *341 valid as against any mortgagee * * * until notice thereof has been filed by the Secretary or his delegate."
Since the chattel mortgages were filed prior to actual notice of the federal tax lien (September 13, 1961), and since openended or future advance mortgages are recognized as valid in this State (see, e.g., Reed v. Rochford, 62 N.J. Eq. 186, 187 (Ch. 1901); Holt v. Creamer, 34 N.J. Eq. 181, 189 (Ch. 1881); and Griffin v. New Jersey Oil Co., 11 N.J. Eq. 49, 52, 53 (Ch. 1855); see generally, 59 C.J.S. Mortgages §§ 175 to 177 (1949)), Webster Factors contends that its claim is superior to that of the United States.
In reply the United States claims that a literal reading of section 3466, Revised Statutes, 31 U.S.C.A. § 191, gives it absolute priority. That section provides, inter alia, "Whenever any person indebted to the United States is insolvent, * * * the debts due to the United States shall be first satisfied."
It is apparent from the preceding that the first point necessitating resolution is the conflict between 26 U.S.C.A. § 6323 (relied upon by Webster) and 31 U.S.C.A. § 191 (relied upon by the United States).
In this regard, the court in United States v. Saidman, 97 U.S. App. D.C. 344, 231 F.2d 503 (D.C. Cir. 1956), stated:
"Notwithstanding the unqualified preference given by Section 3466, persons claiming that they held a perfected and specific lien on the debtor's property have frequently contested the right of the United States to have the debts due it satisfied first. The Supreme Court has, however, never decided whether the absolute priority accorded by Section 3466 would be overcome by a fully perfected and specific lien upon the property, since it has always found that the lien involved was not sufficiently specific and perfected." (at p. 505)
See also United States v. Liverpool & London Ins. Co., 348 U.S. 215, 75 S.Ct. 247, 99 L.Ed. 268 (1955); United States v. Scovil, 348 U.S. 218, 75 S.Ct. 244, 99 L.Ed. 271 (1955); United States v. Security Tr. & Sav. Bk., 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53 (1950).
*342 Although the problem of absolute priority alluded to in the Saidman case remains unresolved insofar as a dispositive United States Supreme Court decision is concerned, I believe that certain federal decisions in the different circuits permit the assumption  which I shall adopt  that a perfected chattel mortgage may constitute a valid exception to section 3466 through the application of section 6323. See, e.g., United States v. Bond, 279 F.2d 837, 841, 847 (4 Cir. 1960), cert. denied 364 U.S. 895, 81 S.Ct. 220, 5 L.Ed.2d 189 (1960). In addition, the following language of the court in Exchange Bank & Trust Co. v. Tubbs Manufacturing Co., 246 F.2d 141 (5 Cir. 1957), cert. denied 355 U.S. 868, 78 S.Ct. 118, 2 L.Ed.2d 75 (1957), rehearing denied 355 U.S. 920, 78 S.Ct. 338, 2 L.Ed.2d 280 (1958), is particularly significant:
"The district court [held] that under the provisions of the priority statute, [31 U.S.C.A. § 191] the claim of the United States was prior and superior to all the other claims * * * [including that of a chattel mortgagee and a municipality].
Appealing from that judgment, the mortgage lien claimants are here contending that the liens created by their chattel mortgages were valid first liens on the respective properties covered, that they attached to the proceeds received from the sale of the respective properties and that they are, therefore, entitled to have applied to their claims the amount of such respective proceeds necessary to satisfy their claims in full.

* * * * * * * *
Urging upon us that under that decision [United States v. Atlantic Municipal Corp., 212 F.2d 709, 711 (5 Cir. 1954) holding that 31 U.S.C.A. § 191 does not apply to a valid, specific and fully perfected choate lien] and [26 U.S.C.A. sec. 6323], mortgage liens cannot, under a claim of priority, be postponed to a federal tax debt, they insist that the judgment was wrong * * *.
The United States, on its part, urging upon us that the claim of the United States, by virtue of the provisions of Sec. 3466 of the Revenue Statutes, the priority section, will be accorded priority over the unperfected, the inchoate tax claim of the City of Dallas, and that it in turn is clearly superior to the chattel mortgage lien claims of the other appellants, insist that of necessity its claim must be prior to those claims * * *. In addition, arguing that the Supreme Court has never held that even a specific and perfected lien would defeat a Sec. 3466 priority claim and that if the liens of the claimants are specific and perfected, this would not avail them, it *343 insists that under federal law appellants' liens are not so specific and perfected since the debtor had not on the date of insolvency been divested either of title or possession of the mortgaged property.
We cannot agree with these views. On the contrary, for the [additional] reason that in this case the mortgage liens are within [26 U.S.C.A. § 6323] and are specifically preserved by that statute against federal tax liens [United States v. Security Trust Co., supra; United States v. Scovil, supra], we are in no doubt that the claim of the United States to priority over the mortgage claims is without foundation." (246 F.2d, at pp. 142-143.)
The court continued:
"We will not, therefore, contribute to the confusion arising from the decisions dealing with the relative standing as to priority of federal tax debts and liens and the numerous and unavailing attempts to rationalize and reconcile them. We will content ourselves with saying that upon a consideration of the relevant facts and a review of the authorities now extant, we are of the clear opinion that the claim of the United States to priority over the mortgage lien is unfounded * * *." (at p. 143)
It is well established that if the lien which is asserted by Webster is sufficiently specific and perfected, then it is "choate" in the federal sense and will overcome the apparently unqualified priority of section 3466. See, e.g., United States v. Gilbert Associates, 345 U.S. 361, 73 S.Ct. 701, 97 L.Ed. 1071 (1953); United States v. Bond, supra, 279 F.2d, at p. 846. In order for a lien to be specific and perfected within the implied exception to section 3466 it must have three definite attributes:
(1) The lienor must be identified; see United States v. Albert Holman Lumber Co., 206 F.2d 685 (5 Cir. 1953), rehearing denied 208 F.2d 113 (5 Cir. 1953);
(2) The amount of the lien must be established; United States v. Saidman, supra;
(3) The property to which the lien attaches must be ascertained; United States v. Albert Holman Lumber Co., supra; United States v. Saidman, supra.
Therefore, if the chattel mortgage lien of Webster is prior to the United States tax lien, and can meet the aforementioned standards, it will not be defeated by section 3466. *344 United States v. Bond, supra; Exchange Bank & Trust Co. v. Tubbs Manufacturing Co., supra.
I think that there can be little doubt that Webster Factors is the lienor under the chattel mortgages and that the precise amount of its lien can be definitely ascertained. The critical problem involves the designation of the property to which the lien attaches. The United States contends that even if Webster Factors can meet the three standards and be superior to the United States' lien on those grounds, it must go further and show that it divested the debtor of the property to which its lien attached.
The United States argues that since it appears that the debtor was permitted to retain possession of the chattels to which Webster's lien was supposed to have attached, and that Webster allowed the receiver to take possession of and sell the property, Webster tacitly renounced its lien in favor of the receiver. By allowing its rights to be modified by the insolvency proceeding the United States concludes that Webster triggered the provision of section 3466.
The force of this argument is not compelling. Where, as here, there is a valid chattel mortgage on specific property to secure ascertained and ascertainable advances, the fact that the lienor permits the receiver to convert the property into cash through a receiver's sale is hardly a renunciation, tacit or otherwise. Furthermore, the chattel mortgages, by their very nature, presumed continued possession by the mortgagor; otherwise the debtor could not use the chattels in the process of paying off its mortgage debt.
To reiterate briefly a portion of the preceding discussion, Webster Factors, by virtue of the recording of its chattel mortgage agreements with Pearl Metal, acquired a specific, perfected and choate lien on the property covered therein, and all advances made by Webster to Pearl Metal under the factoring agreement of December 17, 1954, buttressed by the express language of the chattel mortgages of February 1, 1957 and April 3, 1961, are entitled to prior payment out of the proceeds of the sale of the chattels covered. However, *345 any advances made by Webster after September 13, 1961, the date upon which notice of the tax lien of the United States was filed, cannot be accorded priority over that tax lien. See United States v. Ringler, 166 F. Supp. 544 (D.C.N.D. Ohio, 1958). Webster's lien claim should be diminished accordingly.
The next problem involves the status of the Township of North Bergen's claim for unpaid taxes. In this respect, it is the contention of the township that the receiver is compelled to pay the amount of its tax lien ($944.49) before any other payments are made, excluding wage claims and administrative expenses. In support of this contention the township cites N.J.S.A. 54:4-106 which provides, inter alia, that the receiver "shall take, receive and hold all personal property subject to all unpaid taxes and shall, out of the first moneys received by him, pay to the proper collecting officer * * * all unpaid taxes, [plus interest and penalties]. This payment shall be made before any other payments are made by the receiver [excluding wage claims]."
Accordingly, the township concludes that since the receiver has recognized the priority claim of the township, the statute applies to the exclusion of all other creditors.
In opposition to the above contentions, Webster argues that since the township has not submitted a sworn proof of claim pursuant to R.S. 14:14-15, it is not even entitled to the third priority status given it by the receiver in his final account. Under the circumstances the argument is not compelling. To begin with, the receiver's complaint includes the claim of North Bergen and bestows upon it a priority standing. Additionally, the record in this case includes an order of this court dated March 8, 1962, in which the following language appears: "Ordered, that the tax collector of the Township of North Bergen, be and he is hereby ordered to pay to George Handler, the receiver herein, the sum of $944.49 on taxes erroneously paid by said receiver to North Bergen, without prejudice to the priority claim for taxes of the Township of North Bergen."
*346 Under the circumstances I am of the opinion that any technical defect which may have occurred through the omission to file a sworn proof of claim has been waived, and the only context in which the municipal tax claim will be considered as disputed is in reference to its priority among competing claims.
Secondly, Webster Factors' primary argument against the priority of North Bergen's claim is that N.J.S.A. 54:4-106 applies only after specific liens, such as those asserted by Webster Factors, have been satisfied; that unless and until the municipal personal property tax assessment is enforced by a distress and sale, it is not perfected as against a prior secured creditor.
The early cases dealing with the priority of municipal liens held that the mere assessment of a municipal property tax ipso facto created a lien for priority purposes under N.J.S.A. 54:4-106. See, e.g., Cranbury Twp. v. Chamberlin & Barclay, Inc., 6 N.J. Misc. 39 (Sup. Ct. 1928), affirmed per curiam 105 N.J.L. 236 (E. & A. 1928); Decker v. Decker Bldg. Material Co., 118 N.J. Eq. 177, 179 (Ch. 1935); Spark v. La Reine Hotel Corp., 112 N.J. Eq. 398, 403 (Ch. 1933); Chase Brass, etc., Co. v. Bart Reflector Co., 111 N.J. Eq. 59, 60 (Ch. 1932); Bea v. Turner & Co., 115 N.J. Eq. 189, 190 (Ch. 1934). However, the later cases (which presently represent the law of this State) unequivocally establish that a personal property tax or assessment does not become a lien until the statutory proceeding to enforce the same is taken by levy under a distress warrant. See N.J.S.A. 54:4-78. See also R.C. Stanhope, Inc. v. North Bergen Twp., 129 N.J.L. 513, 517 (E. & A. 1943); Murphy v. Jos. Hollander, Inc., 131 N.J.L. 165 (Sup. Ct. 1943); City of Bayonne v. East Coast Shipyards, Inc., 137 N.J. Eq. 165, 166 (Ch. 1945). Thus, the inescapable conclusion is that the claim of the Township of North Bergen, not having been reduced to the status of a "lien" through the prescribed statutory method prior to the filing of the receiver's complaint, is not prior to the secured claim of Webster *347 Factors. Furthermore, it is also quite clear that the municipality is also subordinate to the claim of the U.S. Government for unpaid taxes. See, e.g., United States v. Waddill, Holland & Flinn, 323 U.S. 353, 65 S.Ct. 304, 89 L.Ed. 294 (1944); Decker v. Decker Bldg. Material Co., supra.
Based upon the foregoing observations, Webster Factors is first entitled to the proceeds realized from the sale of the items covered by the chattel mortgages and factor's notices of lien, and the balance, if any, remaining from said proceeds to be paid to the Government. As to the proceeds realized from the sale of "non-covered" chattels, the Government is entitled to first priority. Finally, North Bergen shall receive the residue. The issue of the amount of compensation and allowances remains.
Initially, there can be no dispute that the countersigner is entitled to $316.95 under the express formula provided in R.R. 4:68-3. On the other hand, the problem of remuneration for the receiver and his attorney requires a more detailed analysis.
N.J.S.A. 14:14-22 provides:
"Before distribution of the assets of an insolvent corporation among the creditors or stockholders, the Superior Court shall allow a reasonable compensation to the receiver for his services and the costs and expenses of the administration of his trust, and the costs of the proceedings in the court, to be first paid out of the assets."
As a general rule, the fair and reasonable value of the receiver's services is computed in proportion to the amount which he has received and administered. See Unger v. Newlin Haines Co., 95 N.J. Eq. 16 (Ch. 1923). In this connection, as was noted in Wasmuth-Endicott Co. v. Washington Towers, Inc., 110 N.J. Eq. 1, 6 (Ch. 1931):
"There is no rule of thumb by which compensation for services of a receiver and his counsel may be measured. Each case must be controlled by its own circumstances. Among the factors to be considered in fixing such compensation are the amount of cash and *348 other assets coming into the receiver's hands; the time occupied by the receiver and his counsel in the performance of their respective duties and their ability and efficiency as officers of the court reflected in the results obtained; the difficulties of conserving and administrating the insolvent estate and the care and fidelity with which those difficulties have been met and surmounted. The fixing of such compensation lies largely in the court's discretion, which should be judiciously exercised, and not abused, but bearing in mind that officers of the court occupying positions of trust and confidence are entitled to just compensation, and with due regard to the claims of creditors and others interested in the assets of the insolvent estate."
The receiver, as of June 7, 1962, spent approximately 175 hours in the administration of the insolvent estate, the gross total of the assets being $38,389.22. The affidavit of the receiver's attorney indicates that he spent a total of 225 hours. Based upon the statements contained in these affidavits  said statements not being refuted by any claimant  and considering the nature of the estate and the type and quality of services rendered, I am of the opinion that the receiver is entitled to an allowance of $2,750 plus costs, and his attorney to an allowance of $3,500 plus costs. In addition to these allowances I am also of the opinion that the attorney for the plaintiff is entitled to a fee of $150 plus costs for the services which he performed for the benefit of the creditors of the insolvent estate. See Laudan v. A.B.C. Travel System, Inc., 64 N.J. Super. 204, 209-210 (Ch. Div. 1960).
Although a question was raised by Webster Factors as to whether or not the award of counsel fees should be charged against personal property and/or real estate, I have been unable to find any authority, nor has any been cited by Webster, which would compel me to deviate from the normal practice of charging these fees and costs against the insolvent's entire estate. Such a course will be followed in this case.
Counsel may present a form of judgment in conformity with this opinion.